**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF INDIANA**

| | | |
|---|---|---|
| GECKO ROBOTICS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case Number: 2:23-CV-00229 |
| | ) | |
| SUMMIT NDE, LLC, JUAN ROBERTO | ) | |
| MENDOZA MORA and ANGEL ORTEGA, | ) | |
| | ) | |
| Defendants. | ) | |

**JUAN ROBERTO MENDOZA MORA AND ANGEL ORTEGA'S**
**AMENDED ANSWERS TO GECKO ROBOTICS, INC.'S COMPLAINT**

Defendants Juan Roberto Mendoza Mora and Angel Ortega (collectively "M/O") hereby answer Plaintiff Gecko Robotics, Inc.'s ("Plaintiff" or "Gecko") Verified Complaint ("Complaint") as follows:

M/O generally deny each and every allegation of the Complaint, except as specifically admitted. Any admitted allegation is admitted only as to the specific factual allegation itself and not as to any conclusions, characterizations, implications, innuendo, or speculation contained in that allegation or in the Complaint as a whole. M/O specifically deny any allegations contained in headings of the Complaint.

**INTRODUCTION**

1.      This case concerns two former Gecko employees (Mendoza and Ortega) who have exploited Gecko's trade secrets to give their new employer (Summit) an unfair "jump start" to replicate cutting-edge ultrasonic inspection technology first pioneered by Gecko, and to target Gecko's customers with that technology.

**ANSWER:**    M/O admit they were former employees of Gecko but deny the remaining allegations in paragraph 1.

2.      Founded in 2013, Gecko has transformed the infrastructure inspection industry. The Company's co-founder built the world's first wall climbing ultrasonic testing robot. That innovation revolutionized the process used by companies to inspect their critical assets by

1

providing unparalleled coverage, productivity and data collection. Since then, Gecko has continued to make rapid advancements in ultrasonic technologies and other inspection solutions, and to develop software to translate robust inspection data into actionable information. Over the past decade, Gecko has become a proven industry leader, providing full-stack robotic inspection and software modeling technology for the world's leading organizations in the power, oil and gas, manufacturing and defense industries.

**ANSWER:** M/O lack knowledge or information sufficient to form a belief as to the truth of the

allegations in paragraph 2 and, on that basis, deny the allegations.

3. Two of Gecko's most recent technological innovations – i.e., Rapid Automated Ultrasonic Testing ("R-AUT") and Tri-Lateral Phased Array ("TriLat") – offer clients unprecedented levels of speed, productivity and detail. These solutions are exponentially superior to any of the other technology currently on the market. Gecko devoted significant time, money and resources to design, develop, commercialize and market these tools and services. The details of those technologies constitute valuable trade secrets, and Gecko devotes significant efforts to maintain the confidentiality of that information.

**ANSWER:** M/O deny the allegations in paragraph 3 to the extent they relate to M/O because

these supposed technological innovations are not trade secrets or technological advances in the

NDT industry.

4. Mendoza and Ortega were employed by Gecko until the summer of 2022, and they both had extensive exposure to and knowledge of Gecko's proprietary and trade secret information, including the Company's R-AUT and TriLat technology.

**ANSWER:** M/O admit they were employed by Gecko and in performing their work necessarily

had access to Gecko equipment and information but deny all other allegations in paragraph 4.

5. After resigning from Gecko, Mendoza and Ortega joined Summit – i.e., a company started by their former (pre-Gecko) colleagues only months earlier. Collectively, Mendoza, Ortega and Summit have misappropriated and exploited Gecko's trade secret information to replicate the Company's R-AUT and TriLat technologies. In so doing, the Defendants have been able to avoid the significant risk, time and expense of independently and fairly designing, developing, commercializing and marketing their own technology.

**ANSWER:** M/O admit they joined Summit, but not at the same time and not both directly from

Gecko. Further answering, M/O deny all other allegations in paragraph 5 to the extent they relate

to M/O.

6.     Indeed, Gecko's recent forensic investigation has revealed that Mendoza downloaded, copied and retained a significant volume (i.e., dozens of gigabytes) of Gecko's electronically stored proprietary and trade secret information relating to the Company's R-AUT and TriLat technologies shortly before he announced his sudden resignation from the Company.

**ANSWER:**     Mendoza admits that he copied Gecko such information.

7.     The Defendants are now marketing their services created using Gecko's misappropriated trade secret information to Gecko's own customers – i.e., the very same customers to whom Mendoza and Ortega provided services during their employment with Gecko.

**ANSWER:**     M/O deny the allegations in paragraph 7 to the extent they relate to M/O.

8.     But for their misappropriation of Gecko's proprietary information, the Defendants would never have been able to replicate Gecko's R-AUT or TriLat technologies so quickly or cheaply – if at all – and they would not have been able to quickly identify and target a set of clients who they know have a need for these technologies.

**ANSWER:**     M/O deny they have replicated any Gecko technologies in their association with

Gecko and deny all other allegations in paragraph 8.

9.     The Defendants are competing unfairly with Gecko and tortiously interfering with the Company's business relationships.

**ANSWER:**     M/O deny the allegations in paragraph 9 to the extent they relate to M/O.

10.     Gecko brings this action to enjoin the Defendants from further misappropriating its trade secrets and tortiously interfering with its current and prospective contracts.  Further, Gecko seeks monetary damages and injunctive relief for harm caused by Defendants in the form (among others) of lost profits, lost customers, lost business opportunities, damage to its reputation and goodwill and the disclosure and use of its trade secret information.

**ANSWER:**     M/O are without information as to the motive(s) of Gecko in bringing this legal

action.  M/O admit that Gecko seeks monetary damages and injunctive relief but denies that Gecko

states any claim, including with respect to allegations regarding the alleged misappropriation of

trade secrets and tortious interference.  M/O deny all other allegations in paragraph 10 to the extent

they relate to M/O.

## PARTIES

11.     Gecko is a Delaware corporation with a principal place of business located at 100 S. Commons, Suite 145, Pittsburgh, Pennsylvania 15212.  Gecko is a developer of state-of-the- art

robotic and other technology designed to facilitate safe, fast and accurate inspection and monitoring of vital infrastructure in a broad range of crucial industries, including power, oil and gas, manufacturing and defense, among others. Gecko is the owner of the trade secrets, confidential information and property misappropriated by the Defendants.

**ANSWER:** M/O deny the allegation that they misappropriated any trade secrets or confidential information of Gecko. M/O lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 11 and, on that basis, denies those allegations.

12.     Summit is an Indiana limited liability company with a principal place of business located at 281 Westmeadow Place, Lowell, Indiana 46356.

**ANSWER:** M/O admit that Summit is a limited liability company but denies the remaining allegations in paragraph 12. Summit's principal place of business is located at 8762 Louisiana St., Suite R, Merrillville, Indiana 46410.

13.     Defendant Mendoza is an individual who, upon information and belief, resides in Chicago, Illinois. Mendoza resigned from his employment with Gecko and is now employed by Summit.

**ANSWER:** Mendoza denies that he has ever resided in Chicago, Illinois. Further answering, Mendoza admits that he resigned from Gecko and is now employed by Summit.

14.     Defendant Ortega is an individual who, upon information and belief, resides in Chicago, Illinois. Ortega resigned from his employment by Gecko and is now employed by Summit.

**ANSWER:** Ortega denies that he has ever resided in Chicago, Illinois. Further answering, Ortega admits that he resigned from Gecko and is now employed by Summit.

15.     Upon information and belief, each Defendant acted in all respects relevant to this action as the agent of the other Defendant, carried out a joint scheme, business plan or policy in all respects relevant hereto. The acts of each Defendant are legally attributable to each of the other Defendants.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. M/O deny any remaining allegations in paragraph 15.

## JURISDICTION AND VENUE

16.     This Court has subject matter jurisdiction over Gecko's federal trade secret claim pursuant to 18 U.S.C. § 1832 *et seq.* and 28 U.S.C. § 1331.  The Court has supplemental jurisdiction over the state law claims alleged in this Complaint pursuant to 28 U.S.C. § 1367.

**ANSWER:**     M/O admit that this Court has subject matter jurisdiction over actions under 18

U.S.C. § 1832 *et seq.* and 28 U.S.C. § 1331.  M/O admit that this action purportedly arises under

the Defend Trade Secrets Act.  M/O deny that they have committed any act of misappropriation,

conspiracy, or other tortious acts as alleged and deny any remaining allegations in paragraph 16.

17.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims alleged in this Complaint occurred in this District, and Defendants are otherwise subject to personal jurisdiction in this District with respect to this action.

**ANSWER:**     This paragraph contains legal conclusions to which no response is required.  Further

answering, M/O deny the allegations in paragraph 17 and further state that pursuant to 28 U.S.C.

§ 1404, for the convenience of the parties and witnesses, and in the interest of justice, this case

should be (and was) transferred to the United States District Court for the Northern District of

Indiana.

## FACTUAL BACKGROUND

**A.     Gecko's Business and Trade Secrets**

18.     Founded in Pittsburgh, Pennsylvania, in 2013, Gecko has emerged as an industry leader in the development of ultrasonic robotic inspection and software solutions.  Gecko's innovative products and inspection systems preserve critical energy infrastructure by detecting defects in manufacturing or deterioration of assets early and precisely, thereby reducing asset failure and avoiding costly environmental remediation.  Gecko markets and sells its advanced inspection technologies and services worldwide, including to customers in the oil and gas, power, manufacturing, pulp and paper, and defense contracting industries.

**ANSWER:**     M/O lack knowledge or information sufficient to form a belief as to the truth of the

allegations in paragraph 18 and, on that basis, deny those allegations.

19.     Gecko's inspection tools and services detect (among other conditions) corrosion and wet hydrogen sulfide damage, including Hydrogen Induced Cracking ("HIC"), Stress Oriented HIC ("SOHIC") and Sulfide Stress Cracking ("SC") in carbon and steel equipment.  The accurate and timely detection of such damage and abnormalities is vital to maintaining not only critical infrastructure, but also public safety.

**ANSWER:**     M/O admit that the accurate and timely detection of certain damage and abnormalities in certain carbon and steel equipment is vital to critical infrastructure and public safety.  M/O lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 19 and, on that basis, deny those allegations.

20.     Gecko operates in an industry that is highly competitive, and the Company devotes significant resources, time and money to maintain its competitive position in the marketplace.

**ANSWER:**     M/O admits that there are numerous NDT companies working throughout the United States.  M/O lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 20 and, on that basis, deny those allegations.

21.     Through its considerable investments of time and resources, Gecko has developed increasingly sophisticated and data-intensive methods of performing inspections, and the Company has steadily built a reputation for quality, efficiency and innovation in the development and delivery of such services.

**ANSWER:**     M/O worked as Advanced Service Technicians for Gecko and lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 21 and, on that basis, deny those allegations.

22.     Gecko also has committed substantial resources and time to develop and maintain information concerning current and prospective clients, to build relationships with key contacts within those organizations, to study their equipment, conditions, environment, needs and preferences, and to develop and maintain long-term relationships and goodwill with those entities. Gecko's relationships with its customers are built on that information as well as trust and personal interactions with decision makers, and they could not easily be replicated without a substantial investment of time, effort and money.

**ANSWER:**     M/O worked as Advanced Service Technicians for Gecko and lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 22 and, on that

basis, deny those allegations. Further answering, PAUT equipment is sold and advertised by third-party manufacturers for doing such inspections. M/O did not use TriLat technology since departing from Gecko.

23.     In carrying out its business activities, Gecko relies on a variety of trade secret and proprietary business information that is the product of the Gecko's substantial expenditure of time, expertise and experience.

**ANSWER:**     M/O denies that Gecko has any trade secrets and/or proprietary business information the latter of which is publicly available. M/O worked as Advanced Service Technicians for Gecko and lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 23 and, on that basis, deny those allegations.

24.     Gecko's proprietary and trade secret information includes, among others, Gecko's customer list and contacts, purchasing history and cycles; pricing methodologies; component information; cost and gross margin information; Gecko's proprietary inspection methods and techniques; inspection results and surveys; information concerning the delivery of Gecko's services; information concerning the data-gathering and data-processing techniques and methodologies; and proposals, quotations, business strategies and budgeting information.

**ANSWER:**     M/O deny the allegations in paragraph 24.

25.     Gecko also relies on valuable trade secrets with respect to two of its newest technologies, Gecko's Rapid Automated Ultrasonic Testing ("R-AUT") and Tri-Lateral Phased Array ("TriLat"), which are discussed more fully below.

**ANSWER:**     M/O deny the allegations in paragraph 25.

26.     **The R-AUT system**: The R-AUT system detects and details corrosion in infrastructure. It uses phased array ultrasonic testing ("PAUT") to generate highly detailed, high-volume data collection in a fraction of the time required for conventional ultrasonic testing ("UT") technology. No other non-destructive testing ("NDT") entity makes use of R-AUT technology in corrosion detection – at least not until Summit began offering that technology in February 2023.

**ANSWER:**     M/O deny the allegations in paragraph 26 as R-AUT is simply PAUT corrosion mapping. M/O deny all other allegations in paragraph 26.

27.     The R-AUT system uses probes composed of several elements and a range of angles that are synthesized by pulse control. In contrast, conventional probes contain single-element probes and fixed angles. Once the control sequence in an R-AUT is defined and programmed, the

ultrasonic pulses are emitted at different angles, enabling them to be sized, swept and steered to provide a "sliced" image view that can reveal difficult-to-detect cracks and other flaws in an asset, and to obtain thickness measurements in corrosion testing.

**ANSWER:**     M/O deny the allegations in paragraph 27 as R-AUT is simply PAUT corrosion

mapping.  M/O deny all other allegations in paragraph 27.

28.     Gecko has developed and relies on a broad range of proprietary and trade secret information relating to its R-AUT technology, including the unique configuration of probe components, the number of elements utilized, the specific roof angles of the probes, passive focusing configuration, the probe pitch, the elevation of the elements as well the precise formulas and customized software used to program the R-AUT system.  Gecko's trade secrets with respect to the R-AUT system also relate to its specific settings, including pulse width, voltage, band pass filtering, compression, and element quantity and size.  The precise configuration and settings associated with the R-AUT system are the result of Gecko's lengthy, onerous and expensive trial-and-error process.

**ANSWER:**     M/O deny the allegations in paragraph 28 as R-AUT is simply PAUT corrosion

mapping.  M/O deny all other allegations in paragraph 28.

29.     Gecko's trade secrets are not readily apparent upon a review of the R-AUT system, due to (among other reasons) the intricacy of the customized formulas and software developed by Gecko to implement the R-AUT system's functionality. In addition, Gecko has developed a unique method of processing, filtering and interpreting the significant volume of data generated using the R-AUT system in order to advise its customers on maintenance and repair efforts necessary to avoid business interruption and asset failure.

**ANSWER:**     M/O deny the allegations in paragraph 29 as R-AUT is simply PAUT corrosion

mapping.  M/O deny all other allegations in paragraph 29.

30.     Gecko does not allow its customers or any other third parties to "tear down" and inspect the internal components of its robots. To the contrary, the Company maintains the confidentiality of that information and retains complete control over the equipment used by it to conduct inspections.

**ANSWER:**     M/O deny the allegations in paragraph 30.

31.     Gecko developed these products and processes during the course of a lengthy trial-and-error process spanning many months. As a part of that iterative process, Gecko made numerous adjustments to its hardware and software composition and configuration specifications so as to successfully commercialize and deploy the R-AUT system.

**ANSWER:**     M/O lack knowledge or information sufficient to form a belief as to the truth of the

allegations in paragraph 31 and, on that basis, deny those allegations.

32.     The R-AUT system provides Gecko with a competitive advantage because it collects and analyzes twelve times the data at five times the speed of other technology currently on the market, and it provides the client with far more detailed, clear data in the process.  R-AUT provides customers with unequaled precision in a fraction of the time needed for conventional UT technology.

**ANSWER:**     M/O deny the allegations in paragraph 32.

33.     **The TriLat system**: The TriLat system is used to detect hydrogen sulfide (H2S) related damage in equipment used in sour service.[1]  Left undetected, H2S damage can cause catastrophic equipment failure of costly, critical processing equipment, particularly in the oil and gas pipeline industry.  Gecko's TriLat system identifies wet H2S damage mechanisms, including HIC, SOHIC and SSC in carbon and low alloy steel equipment. TriLat uses two probes that provide three total inspection angles in one unit to collect and process data at an unprecedented speed and generates images with unparalleled resolution. This unique equipment and service allows customers to detect H2S damage at the earliest stages, allowing for timely, cost-effective and predictable repairs.

**ANSWER:**     M/O lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 33 regarding the TriLat system and, on that basis, deny those allegations. M/O admit that sour service refers to a type of pipeline or storage vessel filled with substances containing hydrogen sulfide ("H2S") or sulfuric acid ("H2SO4"), that sour service is defined by H2S levels above a certain threshold, that sour service can subject vessels to HIC, SOHIC and SCC that undetected H2S damage can cause catastrophic failure of costly, critical processing equipment, and that sour service is of particular concern to the oil, gas, and wastewater industries. Further answering, M/O deny the remaining allegations in paragraph 33.

34.     As is the case with R-AUT, Gecko has developed and relies on a broad range of proprietary and trade secret information with respect to its TriLat system. Those trade secrets relate to such aspects as (among others) the specific configuration, elevation, size, number, angles and pitch of the probe components, as well as the specific settings of the equipment and its software, including pulse width, voltage, band pass filtering and compression.

---

[1] Sour service describes a type of pipeline or storage vessel that is filled with substances that contain (H2S) or sulfuric acid (H2SO4).  For the service to be considered a sour service, the hydrogen sulfide levels must be above a certain threshold.  Sour service can subject the vessel material to corrosion.  Sour service is of particular concern for the oil and gas and wastewater industries.

**ANSWER:**     M/O deny the allegations in paragraph 34.

35.     As is the case with R-AUT, Gecko maintains confidentiality and control over its TriLat equipment and does not permit third parties to view or inspect its internal components.

**ANSWER:**     M/O deny the allegations in paragraph 35.

36.     Gecko has also developed and utilizes a proprietary method to process, filter and interpret the substantial volume of data generated by the TriLat equipment to advise its customers on maintenance and repair efforts necessary to avoid business interruption and asset failure.

**ANSWER:**     M/O deny the allegations in paragraph 36.

37.     Gecko developed that proprietary and trade secret information relating to the TriLat system during the course of an intensive, months-long trial-and-error process involving numerous employees.  No other competitor of Gecko has access to this specifically customized hardware or software, and there are no user manuals available that would allow a competitor to make use of Gecko's customized equipment.

**ANSWER:**     M/O deny that Gecko has identified any proprietary or trade secret information as regards the TriLat system during its trial and error process. Further, Gecko failed to show any proprietary and trade secret information as to TriLat that was utilized by M/O while working at Summit.  While M/O have some information, they lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 37 and, on that basis, deny those allegations.

38.     The TriLat system drastically improves upon various preexisting technologies used to detect HIC cracking, including existing tri-element and triplex technologies used in the NDT industry since 2004.  Both the tri-element and triplex technology produce low quality data that is often misinterpreted and requires follow-up manual (i.e., human) inspection.

**ANSWER:**     M/O deny that Gecko has identified any proprietary or trade secret information as regards the TriLat system during its trial and error process. Further, Gecko failed to show any proprietary and trade secret information as to TriLat that was utilized by M/O while working at Summit.  While M/O have some information, they lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 38 and, on that basis, deny

those allegations.

39.    Gecko's TriLat system provides Gecko's customers with significant cost and time savings.

**ANSWER:**    M/O worked as Advanced Service Technicians for Gecko and lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 39 and, on that basis, deny those allegations.

40.    Gecko's use of phased array in the R-AUT and TriLat systems is unique in the industry and confers a significant competitive advantage on Gecko.

**ANSWER:**    M/O deny the allegation that R-AUT is unique in the industry conferring a competitive advantage. M/O do not use TriLat technology in their work after leaving Gecko and lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 40 and, on that basis, deny those allegations.

41.    A competitor could not replicate Gecko's R-AUT or TriLat systems and the proprietary and trade secret information associated therewith without a significant investment of time, money and other resources.

**ANSWER:**    M/O deny the allegation that R-AUT cannot be replicated as that technology is sold by third-party manufacturers of all the equipment needed to conduct corrosion mapping.  M/O do not use TriLat technology in their work after leaving Gecko and lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 41 and, on that basis, deny those remaining allegations.

**B.    Gecko Maintains the Secrecy of Its Proprietary and Trade Secret Information**

42.    Gecko takes reasonable steps to maintain the secrecy of its proprietary and trade secret information, including, without limitation, the aforementioned information relating to the Company's R-AUT and TriLat tools and services.  The aforementioned information is maintained on a protected drive that is accessible by a small number of Gecko employees.

**ANSWER:**    M/O deny the allegation that Gecko takes reasonable steps to maintain the secrecy of its proprietary and trade secret information.  M/O further deny that Gecko has identified any

trade secret information. M/O lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 42 and, on that basis, deny those allegations.

43. Gecko utilizes password restrictions on employees' computers and the Company's computer systems, limits access to its proprietary and trade secret information on a strict "need-to-know" basis and instructs employees not to use or disclose the Company's confidential information for the benefit of anyone other than the Company.

**ANSWER:** M/O lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 43 and, on that basis, deny those allegations.

44. Further, the Company's employee handbook provides, in relevant part, as follows:

**10.1 Confidentiality**

Employees have an ethical duty not to disclose confidential information gleaned from business transactions and internal communications and to protect confidential relationships between Gecko Robotics and its contacts and constituents. Employees also have an ethical responsibility not to use organizational-related information for personal reasons or personal gain. At the time of hire, all employees are required to sign the Confidential Information and Invention Assignment Agreement, which outlines the expectation that employees will not disclose any proprietary company information to audiences outside of the Company. Breach of confidentiality or misuse of the information is a serious offense and may result in disciplinary action up to and including termination of employment.

**ANSWER:** M/O admit there is a Gecko employee handbook that contains information as set forth in the allegations in paragraph 44. However, this is an integrated document and must be read in context, particularly as Mendoza did not sign Confidential Information and Invention Assignment Agreement.

45. All employees granted access to Gecko's proprietary and trade secret information are required to sign confidentiality agreements that, among other things, prohibit them from accessing or using that information for any purpose other than for the benefit of Gecko, and prohibits the disclosure of such confidential information to others. Those agreements also require employees to return all such information and materials at the termination of employment.

**ANSWER:** M/O lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 45 and, on that basis, deny those allegations. Further answering, Mendoza denies having signed a Confidential Information and Invention Assignment Agreement. Ortega admits he signed a Confidential Information and Invention Assignment Agreement. Mendoza and Ortega returned information and materials before leaving Gecko (the return of which were audited by Gecko representatives). Both men have subsequently returned computer files during the course of this matter. Mendoza has returned Gecko equipment.

46. Gecko further protects its proprietary and trade secret information by limiting the content of any public disclosure concerning its equipment and services only to the extent necessary, and otherwise ensuring that any private disclosure to suppliers involved in the development process for both the R-AUT and TriLat systems is made only to the extent necessary and is covered by non-disclosure agreements.

**ANSWER:** M/O deny the allegation that Gecko protects its proprietary and trade secret information by limiting the content of any public disclosure concerning its equipment and services only to the extent necessary as Plaintiff has numerous webinars and articles describing thes technologies. M/O lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 46 and, on that basis, deny those allegations.

47. Gecko's facilities are physically secured and protected, and visitors are prevented from accessing the trade secrets and otherwise required to execute appropriate non-disclosure agreements before they are permitted in the Company's facilities.

**ANSWER:** M/O lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 47 and, on that basis, deny those allegations.

48. Gecko uses and relies upon its proprietary and trade secret information to maintain its competitive position.

**ANSWER:** M/O deny that Gecko has any proprietary and trade secret information regarding R-AUT. Neither man has made use of TriLat technology. Further answering, M/O lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in

paragraph 48 and, on that basis, deny those allegations.

49.     Gecko's proprietary and trade secret information derives its value from remaining confidential.

**ANSWER:**     M/O lack knowledge or information sufficient to form a belief as to the truth of the

allegations in paragraph 49 and, on that basis, deny those allegations.  M/O further deny that Gecko

has identified any proprietary or trade secret information and have kept such proprietary and trade

secret information confidential.

50.     If disclosed, Gecko's proprietary and trade secret information would provide an unfair advantage to a competitor.

**ANSWER:**     M/O deny that Gecko has identified any proprietary or trade secret information in

its Complaint or at the preliminary injunction hearing. M/O lack knowledge or information

sufficient to form a belief as to the truth of the allegations in paragraph 50 and, on that basis, deny

those allegations.

**C.     Mendoza's and Ortega's Employment with Gecko**

51.     Gecko employed Mendoza and Ortega as service technicians.  In that capacity, they performed inspections at customer sites, worked with Gecko's proprietary equipment and assisted in gathering, processing and interpreting data gathered by the Company and provided to its clients, among other activities.

**ANSWER:**     M/O admit they were employed as Advanced Service Technicians performing

various services for Gecko.

52.     As a condition of his employment with the Company, Mendoza signed a Confidential Information and Invention Assignment Agreement ("Mendoza Agreement") dated September 16, 2020.  The Mendoza Agreement is attached hereto as Exhibit A.

**ANSWER:**     Mendoza denies the allegations in paragraph 52.

53.     As a condition of his employment with the Company, Ortega also signed a Confidential Information and Invention Assignment Agreement ("Ortega Agreement," and together with the Mendoza Agreement, the "Agreements"), dated December 28, 2020.  The Ortega Agreement is attached hereto as Exhibit B.

**ANSWER:**     Ortega admits the allegations in paragraph 53.

54.     The Agreements are substantively identical.

**ANSWER:**     Ortega submits that the best evidence of the contents of his agreement is the

agreement itself.  Mendoza denies signing the Confidential Information and Invention Assignment

Agreement.

55.     Pursuant to their respective Agreements, Mendoza and Ortega agreed not to use or disclose any Confidential Information relating to Gecko or its business activities other than for the benefit of Gecko.  (Agreement § 3.)  "Confidential Information" is defined broadly as follows:

> information and physical material not generally known or available outside the Company and information and physical material entrusted to the Company in confidence by third parties. Confidential Information includes, without limitation: (i) Company Inventions (as defined below); and (ii) technical data, trade secrets, know-how, research, product or service ideas or plans, software codes and designs, algorithms, developments, inventions, patent applications, laboratory notebooks, processes, formulas, techniques, biological materials, mask works, engineering designs and drawings, hardware configuration information, agreements with third parties, lists of, or information relating to, employees and consultants of the Company (including, but not limited to, the names, contact information, jobs, compensation, and expertise of such employees and consultants), lists of, or information relating to, suppliers and customers (including, but not limited to, customers of the Company on whom [he] called or with whom [he] became acquainted during the Relationship), price lists, pricing methodologies, cost data, market share data, marketing plans, licenses, contract information, business plans, financial forecasts, historical financial data, budgets or other business information disclosed to [him] by the Company either directly or indirectly, whether in writing, electronically, orally, or by observation.

(Id. § 3(b).)

**ANSWER:**     Ortega admits his agreement generally contains information as set forth in the

allegations in paragraph 55.  However, this is an integrated document and must be read in context.

Mendoza denies signing a Confidential Information and Invention Assignment Agreement.

56.     Mendoza and Ortega also agreed to certain restrictions on the scope of their post-employment conduct.  Among other such obligations, they each agreed that they would:

> Promptly make full written disclosure to the Company, will hold in trust for the sole right and benefit of the Company, and hereby assign to the Company, or its designee, all [his] right, title and interest throughout the world in and to any and all Company Inventions and all patent, copyright, trademark, trade secret and other intellectual property rights therein.,…[and] further acknowledge that all Company Inventions that are made by [him] (solely or jointly with others) within the scope of and during the period of the Relationship are "works made for hire"(to the greatest extent permitted by applicable law) and are compensated by [his] salary.

(Id. § 4(d).)

**ANSWER:**   Ortega admits his agreement generally contains information as set forth in the

allegations in paragraph 56. However, this is an integrated document and must be read in context.

Mendoza denies signing a Confidential Information and Invention Assignment Agreement.

57.   Mendoza and Ortega are further obligated to:

> deliver to the Company (and will not keep in [his] possession, recreate or deliver to anyone else) any and all devices, records, data, note, reports, proposals, lists, correspondence, specifications, drawings, blueprints, sketches, laboratory notebooks, materials, flow charts, equipment, other documents or property, or reproductions of any of the aforementioned items developed by [him] pursuant to the Relationship or otherwise belonging to the Company, its successors or assigns.

(*Id.* § 5.)

**ANSWER:**   Ortega admits his agreement generally contains information as set forth in the

allegations in paragraph 57. However, this is an integrated document and must be read in context.

Mendoza denies signing a Confidential Information and Invention Assignment Agreement.

58.   Mendoza and Ortega also acknowledged and agreed that Gecko's Confidential Information includes information relating to Gecko's employees, consultants, customers and others, and that they would not use or disclose such Confidential Information except as authorized by Gecko.  Mendoza and Ortega further agreed that:

> (a)   …during the term of the Relationship and for a period of twelve (12) months immediately following the termination of the Relationship for any reason, whether with or without cause, I shall

not, directly or indirectly, solicit, induce, recruit or encourage any of the Company's employees or consultants to terminate their relationship with the Company, or attempt to solicit, induce, recruit, encourage or take away employees or consultants of the Company, either for myself or for other person or entity.

(b)     …during the term of the Relationship, I will not negatively influence any of the Company's clients, licensors, licensees or customers from purchasing Company products or services or solicit or influence or attempt to influence any client, licensor, licensee, customer or other person either directly or indirectly, to direct any purchase of products and/or services to any person, firm, corporation, institution or other entity in competition with the business of the Company…. I acknowledge the Company has valuable Trade Secrets (as defined by applicable law from time to time) to which I will have access during the term of the Relationship. I understand that the Company intends to vigorously pursue its rights under applicable Trade Secrets law if, during a period of twelve (12) months immediately following the termination of the Relationship for any reason, whether with or without cause, I solicit or influence or attempt to influence any client, licensor, licensee, customer or other person either directly or indirectly, to direct any purchase of products and/or services to any person, firm, corporation, institution or other entity in competition with the business of the Company.  Thereafter, the Company intends to vigorously pursue its rights under applicable Trade Secrets law as the circumstances warrant.

(*Id.* § 8(a)-(b).)

**ANSWER:**    Ortega admits his agreement generally contains information as set forth in the

allegations in paragraph 58. However, this is an integrated document and must be read in context.

Mendoza denies signing a Confidential Information and Invention Assignment Agreement.

59.     In reliance on the above promises and representations, among others, Gecko provided Mendoza and Ortega with access to its proprietary and trade secret information throughout the course of their employment, including information relating to the Company's TriLat and R-AUT services.

**ANSWER:**    M/O lack knowledge or information sufficient to form a belief as to the truth of the

allegations in paragraph 59 and, on that basis, deny those allegations.

60.     Mendoza was involved in Gecko's development and commercialization of the TriLat and R-AUT services.  Ortega had exposure to the development process with respect to those services.  He also had ready access to the trade secret information relating to the marketing and commercialization of both technologies.

**ANSWER:**     Mendoza admits he had involvement in some of Gecko's offered services.  Ortega admits he had familiarity with some of Gecko's offered services but denies the remaining allegations in paragraph 60.

61.     Further, Mendoza and Ortega had access to and knowledge of proprietary and trade secret information relating to Gecko's technologies, inspection methods, services, materials, pricing, costs, products, customers and vendors.

**ANSWER:**     M/O deny there was any proprietary and trade secret information that Gecko developed regarding PAUT corrosion mapping.  Neither man ever utilized TriLat technology after leaving Gecko. M/O lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 61 and, on that basis, deny those allegations.

62.     Gecko would have never provided such information to Mendoza or Ortega without their agreement to comply fully with all the terms of the Agreements as well as their legal obligations to protect the confidentiality of that information.

**ANSWER:**     M/O lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 62 and, on that basis, deny those allegations.

63.     Ortega resigned from his position with Gecko on May 24, 2022.

**ANSWER:**     Ortega admits that he resigned on May 27, 2022.

64.     Mendoza resigned from his position with Gecko on July 21, 2022.

**ANSWER:**     Mendoza admits the allegations in paragraph 64.

65.     When he resigned, Mendoza improperly retained various Gecko equipment, including three separate PAUT probes as well as a software key used by Gecko with respect to the TriLat and R-AUT services, all of which is worth tens of thousands of dollars (the "Retained Equipment").

**ANSWER:**     Mendoza admits that he retained some Gecko equipment during his transition from

Gecko to Summit but all such equipment has been returned.

**D.  Defendants Misappropriate Gecko's Trade Secrets to "Jump Start" a Competing Business.**

66.  Shortly after his resignation, Gecko learned that Mendoza had accepted an employment position with Summit.

**ANSWER:**  Mendoza lack knowledge or information sufficient to form a belief as to the truth of the allegations as to Gecko learning of Mendoza's employment status with Summit, but admits he accepted employment with Summit.

67.  According to the Indiana Secretary of State, Summit was founded in January of 2022 and has its principal place of business in Lowell, Indiana.

**ANSWER:**  M/O are without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 67.

68.  Despite having been in business for less than a year, Summit claims to serve clients "across the world."

**ANSWER:**  M/O admit that text on Summit's website states "Serving Our Clients Across The World!" which is simply a marketing moniker much like R-AUT, which is not more rapid than PAUT corrosion mapping, but nevertheless is marketed as such.

69.  Like Gecko, Summit purportedly performs inspections and non-destructive examinations for various industries which are serviced by Gecko, including oil and gas, and manufacturing.

**ANSWER:**  This allegation is not addressed to M/O and therefore, no answer to this allegation is required.

70.  According to information contained on Summit's LinkedIn page, Summit currently has twelve employees.

**ANSWER:**  This allegation is not addressed to M/O and therefore, no answer to this allegation is required.

71.     Upon information and belief, Summit was founded and is operated by a number of individuals with whom Mendoza worked before they joined Gecko.

**ANSWER:**     This allegation is not addressed to M/O and therefore, no answer to this allegation is required. Further answering, Mendoza did work with other Advanced Service TEchnicians who had previously worked at Gecko.

72.     In the wake of those developments, Gecko (via counsel) contacted Mendoza and Summit via correspondence dated August 19, 2022.  In that letter, Gecko requested information and assurances from Mendoza and Summit intended to address Gecko's concerns (among others) that those parties may be misusing Gecko's proprietary and trade secret information.

**ANSWER:**     Mendoza admits that Gecko (via counsel) sent correspondence dated August 19 to Mr. Michael Lewandowski (Summit) and Mendoza. Further answering, the content of that letter speaks for itself and deny any characterization by Plaintiff.  Mendoza denies the remaining allegations in paragraph 72.

73.     In a response dated August 31, 2022, counsel for Summit and Mendoza advised Gecko that Mendoza had been hired as an "advance services technician."  Counsel also provided many of the assurances requested, including the following:

> Summit has not received any proprietary information from Mr. Mendoza Mora and will not seek to obtain any such information from him…. Summit will continue to operate in the same normal fashion that it has for years and will not solicit any claimed proprietary information from its employee.  Mr. Mendoza Mora has further advised that he understands his responsibilities under the Confidential Information and Invention Assignment Agreement ("NDA") and will not violate those provisions allowed under law.

**ANSWER:**     Mendoza admits that the text quoted in paragraph 73 appears to have been excerpted from an August 31, 2022 letter from Summit's counsel that was sent in response to an August 19, 2022 letter from Gecko's counsel, and that the letter from Summit's counsel provided certain assurances.  Mendoza denies all other allegations in paragraph 73.

74.     In its letter, Gecko had also requested the return of the Company's Retained Equipment.  Despite follow-up correspondence on that topic between counsel for the parties, Mendoza ultimately failed to return that equipment and has instead claimed that the equipment

had either been returned to the Company (it had not) or that he did not have the equipment that Gecko was seeking.

**ANSWER:**   Mendoza admits that the August 19, 2022 letter from Gecko's counsel requested the return of certain equipment from Mendoza, and that there was follow-up correspondence on that topic between counsel for the parties. On information and belief, Mendoza denies all other allegations in paragraph 74.

75.   Separately, in October, 2022, Gecko learned that Ortega had accepted a position with Summit as well.  To that end, Gecko sent a letter to Summit's counsel and requested information and assurances concerning Summit's employment of Ortega.  Neither Summit nor Ortega ever responded to that letter.

**ANSWER:**   Ortega lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 75 and, on that basis, denies the allegations.

76.   As Gecko has discovered recently, the representations and assurances provided by Summit's and Mendoza's counsel back in August 2022 were categorically false.

**ANSWER:**   Mendoza denies the allegations in paragraph 76.

77.   In February of 2023, Summit published online (and then quickly deleted) several LinkedIn posts reflecting that that company is actively marketing products and services to customers that are substantially similar or virtually identical to Gecko's R-AUT and TriLat technologies.

**ANSWER:**   M/O are not mentioned in the allegations in paragraph 77 and therefore no answer to this allegation is required.

78.   Those posts included photographs of Mendoza and Ortega demonstrating those competitive products to one of Gecko's customers, Marathon Petroleum Corporation.

**ANSWER:**   M/O admit that a LinkedIn post included photographs demonstrating an unfinished mockup for application of PAUT, not TriLat at Marathon-Detroit. M/O lack knowledge or information sufficient to form a belief as to the truth of the allegation that Marathon Petroleum Corporation is a customer of Gecko and, on that basis, denies the allegation.

79.     During their tenure with Gecko, Mendoza and Ortega provided services to Marathon Petroleum Corporation.

**ANSWER:**     M/O admit that during their tenure with Gecko they provided services as directed

by Gecko.  However, M/O did not provide services to Marathon Detroit but did present a lunch

and learn presentation.

80.     Before Mendoza and Ortega began working for Summit, Summit did not offer customers any services that were substantially similar or virtually identical to Gecko's R-AUT and TriLat technologies.

**ANSWER:**     M/O are not mentioned in the allegations in paragraph 80 and therefore no answer

to this allegation is required.

81.     Just a mere few months after Mendoza and Ortega joined Summit, they were marketing those same products and services to customers to whom they previously provided such services and products on Gecko's behalf.

**ANSWER:**     M/O lack knowledge or information regarding the meaning of "they were

marketing those same products and services" sufficient to form a belief as to the truth of the

allegations in paragraph 81 and, on that basis, denies those allegations.

82.     Without using or relying upon Gecko's proprietary and trade secret information relating to its R-AUT and TriLat technologies, Summit could not have developed and commercialized such products and services in such a short time.

**ANSWER:**     M/O are not mentioned in the allegations in paragraph 77 and therefore no answer

to this allegation is required.

83.     Upon information and belief, Mendoza and Ortega used and disclosed Gecko's proprietary and trade secret information during the course of their employment with Summit to help Summit develop and commercialize products and services that are substantially similar or virtually identical to Gecko's R-AUT and TriLat technologies, including (without limitation):

   a.     information relating to the unique configuration of probe components, the number of elements utilized, the specific roof angles of the probes, passive focusing configuration, the probe pitch, the elevation of the elements and/or precise formulas and customized software used to program the R-AUT and TriLat systems;

    b.    specific settings, including pulse width, voltage, band pass filtering, compression and/or element quantity and size; and/or

    c.    the details of Gecko's lengthy, onerous and expensive trial-and-error process associated with the development the R-AUT and TriLat systems.

**ANSWER:**    M/O admit there was limited information they conveyed to Summit, but deny that any such information contained any proprietary and trade secrets.

84.    Upon information and belief, Mendoza and Ortega have also used and disclosed other proprietary and trade secret information belonging to Gecko, including but not limited to Gecko's component information; cost and gross margin information; and Gecko's proprietary inspection methods and techniques for the benefit of Summit in order to market and commercialize products and services that are substantially similar or virtually identical to Gecko's R-AUT and TriLat technologies.

**ANSWER:**    M/O admit there was limited information they conveyed to Summit, but deny that any such information contained any proprietary and trade secrets. Further answering, no information on pricing was ever used by Summit.

85.    Ortega boasts on his LinkedIn page that he was hired by Summit to perform inspection services for Summit clients "throughout North America" using "Automated PAUT Corrosion mapping" and "Automated PAUT/TOFD Weld Inspection," among other technologies" (i.e., copies of Gecko's R-AUT services). According to his LinkedIn page, Ortega joined Summit in August, 2022 – i.e., at the same time that Mendoza did.

**ANSWER:**    Ortega denies any boasting on his LinkedIn page other than relating inspection services he had learned over the course of years in school and on the job. Ortega denies making any reference to Gecko's services (R-AUT or TriLat). Ortega admits that he was hired by Summit as an Advanced Service Technician.

86.    Mendoza markets himself on LinkedIn as an "Advanced Ultrasonics Specialist" for Summit, signifying himself as an expert in the delivery of the very same specific technologies and products that he provided to Gecko's customers on Gecko's behalf.

**ANSWER:**    Mendoza admits that he markets himself as an Advanced Ultrasonics Specialist which is true based on over 29 years in the NDT industry. Mendoza denies that he markets himself

as delivering Gecko technologies in his role as the Advanced Ultrasonics Specialist only that he offers the same services that are offered by any number of other non-destructive evaluation companies.

87.     In February of 2023, Gecko also learned that Summit had successfully diverted at least one project from one of Gecko's customers, Exxon Joliet Refinery in Will County, Illinois. Upon information and belief, the Defendants diverted that project by utilizing Gecko's trade secret information concerning its pricing, cost and other customer-related information and quoted a price for their services that was just slightly below Gecko's.

**ANSWER:**     M/O are not mentioned in the allegations in paragraph 87 and therefore no answer to this allegation is required.  To the extent an answer is required, M/O did not use non-existent Gecko trade secrets and the decision by ExxonMobil-Joliet not to use Gecko anymore was a decision made by the refinery.

88.     Upon information and belief, Ortega and Mendoza improperly used and relied upon their knowledge of Gecko's proprietary and trade secret information relating to Exxon Joliet Refinery to divert the project from Gecko to Summit.

**ANSWER:**     M/O deny the allegations in paragraph 88.

89.     Upon information and belief, before Ortega and Mendoza joined Summit, Summit was not doing business with the Exxon Joliet Refinery in particular or Exxon more broadly.

**ANSWER:**     M/O are not mentioned in the allegations in paragraph 89 and therefore no answer to this allegation is required.

90.     Given the nature of the industry in which Gecko and Summit operate, customers do not routinely disclose competing bidders or detail their reasons for selecting a particular service provider.  As a consequence, it is exceedingly difficult for Gecko to determine which other customers have been diverted by the Defendants.

**ANSWER:**     M/O are not mentioned in the allegations in paragraph 90 and therefore no answer to this allegation is required.  To the extent an answer is required, M/O cannot comment on what unspecified customer do regarding bidding processes.

91. Upon information and belief, Defendants are targeting specific customers to which Mendoza and Ortega provided services on Gecko's behalf – and about which Mendoza and Ortega obtained trade secret information during the course of their employment with Gecko.

**ANSWER:** M/O deny the allegations in paragraph 91.

92. Gecko has also recently learned that, after his resignation from Gecko, Mendoza contacted at least one Gecko vendor – a vendor that was involved in the Company's development of its R-AUT and TriLat technology – for the purpose of obtaining certain components that had been custom-made for Gecko. Mendoza knew about that vendor and those components solely by virtue of his involvement in the Company's development of those products. That information constitutes trade secrets and is highly proprietary.

**ANSWER:** Mendoza denies the allegations in paragraph 92. Further answering, Mendoza knew the vendor referenced in paragraph 92 for many years, well before Gecko's NDT division came into existence in 2013. Custom-made components needed by NDE companies can be bought off of the Evident-Olympus as well as other manufacturers ' web pages.

93. Upon information and belief, Mendoza and Ortega joined Summit specifically to help that company develop, commercialize, market and provide services substantially similar or virtually identical to those they delivered on Gecko's behalf, including Gecko's TriLat and R-AUT services. In so doing, Mendoza and Ortega have used and disclosed their knowledge of Gecko's proprietary and trade secret information relating to those technologies and Gecko's business more broadly.

**ANSWER:** M/O deny the allegations in paragraph 93.

94. Upon information and belief, Mendoza and Ortega have also used and disclosed their knowledge of Gecko's proprietary and trade secret information to enable Summit to bid for and divert work from Gecko to Summit.

**ANSWER:** M/O deny the allegations in paragraph 94.

95. Upon information and belief, the Defendants are exploiting Mendoza's and Ortega's knowledge of Gecko's proprietary and trade secret information in an improper attempt to replicate Gecko's services and market those services to Gecko's customers as a "cheaper alternative."

**ANSWER:** M/O deny the allegations in paragraph 95.

96. Through their misconduct, Mendoza and Ortega have given Summit an improper "jump start" so as to enable it to compete unfairly with Gecko.

**ANSWER:** M/O deny the allegations in paragraph 96.

97.     Summit knew about Mendoza's and Ortega's knowledge concerning Gecko's proprietary and trade secret information, their confidentiality obligations to Gecko and Gecko's stated concerns about their misuse of that information.  Despite that knowledge, Summit actively encouraged, assisted and otherwise conspired with Mendoza and Ortega each step of the way to exploit that information, to tortiously interfere with Gecko's customers and to compete unfairly with Gecko.

**ANSWER:** M/O are not mentioned in the allegations in paragraph 90 and therefore no answer to this allegation is required.  Further answering, to the extent an answer is required, M/O deny the allegations in paragraph 97 of exploiting non-existent trade secrets.

98.     Under the circumstances, there is a substantial likelihood that Mendoza and Ortega will be called upon to use or disclose Gecko's trade secrets in executing their job responsibilities for Summit, making it inevitable that the Defendants will continue to misappropriate Gecko's trade secrets.

**ANSWER:** M/O deny the allegations in paragraph 98.

99.     After Summit posted (and then quickly deleted) the LinkedIn posts referenced above, Gecko's counsel again wrote to Summit's and Mendoza's counsel on February 24, 2023, seeking information and assurances concerning the Defendants' activities.  The Defendants did not provide a substantive response to Gecko's letter.

**ANSWER:** M/O admit that counsel received a letter from Gecko's counsel dated February 24, 2023.  Further answering, M/O deny all other allegations in paragraph 99.

100.     Gecko has also learned that Ortega has recently attempted to solicit a current Gecko technician – who is privy to Gecko trade secrets, including its customers and proprietary inspection methods – to leave Gecko and to work for Summit instead, in violation of the non-solicitation provision.

**ANSWER:** Ortega denies the allegation in paragraph 100.

**E.     Mendoza Secretly Downloads and Copies a Large Volume of Gecko's Files Relating to Its TriLat and R-AUT Services.**

101.     In the wake of recent alarming developments, Gecko has begun conducting a forensic examination of Mendoza's Company-issued laptop computers.  That investigation is in its early stages and remains ongoing.  Even at this early juncture, however, Gecko has already discovered that Mendoza secretly downloaded and copied dozens of gigabytes of Gecko's files

containing trade secret information relating to the Company's TriLat and R-AUT services before he announced his resignation to Gecko.

**ANSWER:**   Mendoza admits that in the regular course of business performing inspections and writing inspection reports while at Gecko, he would download information in order to complete a customer's inspection report.   Further answering, Mendoza admits that he downloaded other Gecko information.

102.   Mendoza began downloading, copying and transferring that information in the weeks leading up to his resignation, reaching a fever pitch on July 20, 2022 – i.e., the day before his resignation.

**ANSWER:**   Mendoza is without information as to what it means "reaching a fever pitch".   To the extent an answer is required, Mendoza admits that he did copy some Gecko information prior to his departure from the Plaintiff.

103.   Gecko's investigation indicates that Mendoza downloaded, copied and took thousands of files, which include (among others) the Company's internal proprietary information necessary to calibrate, use and analyze the Company's technology as well as the results of the Company's work conducted for numerous customers.

**ANSWER:**   Mendoza admits that he did copy some Gecko information prior to his departure from the Plaintiff.   Further answering, Mendoza had several customer projects ongoing and did download information in order to complete a customer's inspection report before leaving Gecko.

104.   Mendoza downloaded and copied information relating to the Company's work for Marathon Petroleum – i.e., the very same customer to whom Mendoza was "demonstrating" Summit's knock-off technology in February, 2023.   Mendoza downloaded and copied other information relating to Gecko customers located within the vicinity of Summit's principal place of business in Indiana.

**ANSWER:**   Mendoza admits that he did copy some Gecko information that may have included Marathons Petroleum and did contain other Gecko customers prior to his departure from the Plaintiff.

105.   The information downloaded and copied by Mendoza includes numerous Olympus WeldSight files, which include data gathered by Gecko using its TriLat and R-AUT services.   To

access those files, Mendoza would have needed a software key. That exact software key was one piece of Gecko's property improperly retained by Mendoza upon his resignation.

**ANSWER:** Mendoza admits that he did copy some Gecko information prior to his departure

from the Plaintiff. Mendoza utilized a WeldSight™ software key to access same. This key has

been returned to Gecko.

106. Gecko's forensic review of Mendoza's computer also indicates that Mendoza had accepted a job with Summit before he announced his intention to resign, and that he was in active discussions with Summit concerning potential employment at the same time as he began copying Gecko's data.

**ANSWER:** Mendoza admits that he accepted a job with Summit prior to announcing his

intention to resign from Gecko.

107. Mendoza connected at least *twelve* external hard drives to his Gecko-issued computer in 2022 – and 4 in July of 2022 alone. Gecko's forensic investigation indicates that those external hard drives contain a significant volume of Gecko's proprietary and trade secret information. Mendoza did not return any of those hard drives when he resigned from the Company.

**ANSWER:** Mendoza admits that he did download information during his time with Gecko but

does not remember the number of hard drives he used for this.

108. Gecko's forensic investigation also reveals that Mendoza viewed his own Confidential Information and Invention Assignment Agreement with Gecko on numerous occasions in 2022 (including in April, May and early July). In other words, Mendoza secretly copied dozens of gigabytes of Gecko's information knowing full well that he was prohibited from doing so.

**ANSWER:** Mendoza denies signing a Confidential Information and Invention Assignment

Agreement. Mendoza admits that he accessed his personnel file on line during May 2022 upon which he

saw for the first time the purported Confidential Information and Invention Assignment. Mendoza does

not believe this document applies to him as he never signed it. Mendoza admits that he copied Gecko

information prior to his departure from the Plaintiff.

109. Gecko's forensic investigation also reveals that on July 20, 2022 – i.e., one day before his resignation – Mendoza accessed a webpage providing guidance on how to use Microsoft's Snipping Tool to capture screenshots. The Snipping Tool is a Microsoft feature that

allows its user to capture content displayed on a computer screen (colloquially called "screenshots" or "screencaptures") and save that content as a separate file, essentially rendering the captured content untraceable. It appears that Mendoza used the Snipping Tool later that same day.

**ANSWER:** Screen shots were an essential tool used every day on reports prepared for customers. Mendoza admits that he accessed a webpage for Microsoft's snipping tool but is without sufficient information to know the exact date.

110. The aforementioned information that was improperly downloaded, copied and taken by Mendoza is referred to collectively as "Gecko's Stolen Files."

**ANSWER:** Mendoza admits having taken file material from Gecko prior to his departure.

111. Gecko's investigation further indicates that Mendoza began deleting a large number of files on his computer on July 7, 2022 and continuing through July 20, 2022.

**ANSWER:** Mendoza admits to having deleted some files on his computer as they represented information that was already put into customer's reports and associated data provided. In addition, Mendoza admits he may have deleted other files on this computer.

112. In sum, Gecko's forensic investigation to date indicates that Mendoza secretly downloaded, copied and took all of the proprietary and trade secret information one would need to replicate Gecko's business as well as the Company's TriLat and R-AUT technologies when Mendoza knew that he would be joining Summit. Mendoza knew that his activities were improper, and he sought to conceal them from Gecko. Mendoza (and the other Defendants) then provided false "assurances" to Gecko that no such information was ever taken or misused. In fact, Mendoza and the other Defendants used Gecko's Stolen Files and other trade secret information to replicate Gecko's TriLat and R-AUT technologies and have begun marketing those services to customers that the Defendants knew are being serviced by Gecko, using materials that the Defendants stole from the Company.

**ANSWER:** Mendoza admits downloading, copying, and taking files upon his departure from Gecko. Mendoz denies that he copied R-AUT or TriLat for the purpose of replicating such technologies, because R-AUT is PAUT, a technology which has been around for decades. Further, he has made no use of TriLat since leaving Gecko. Further answering, Mendoza admits that he joined Summit in July 2022.

113.    Gecko's investigation is not yet complete, and much of the information necessary to complete that analysis remains in the exclusive possession of Mendoza and the other Defendants.

**ANSWER:**    Mendoza lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 113 as to the status of Gecko's investigation.  Mendoza admits that he turned in on two separate occasions Gecko files from his hard drive devices prior to the hearing on preliminary injunction.

114.    As a direct and proximate result of the Defendants' conduct, Gecko has suffered substantial monetary and reputational harm.

**ANSWER:**    M/O deny the allegation that Gecko has suffered substantial monetary or reputational harm as a direct or proximate result of their conduct.  Further answering, M/O lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 114 and, on that basis, denies those allegations.

115.    Absent relief from this Court, Defendants' conduct will cause Gecko to suffer further irreparable harm in the form of lost profits, lost customers, lost business opportunities, damage to its reputation and goodwill and the disclosure and use of its trade secret information. Gecko has no adequate remedy at law for many of these injuries.

**ANSWER:**    M/O deny that their conduct has caused or will cause Gecko to suffer irreparable harm, including anything related to lost profits, lost customers, lost business opportunities, damage to its reputation or goodwill, or the disclosure or use of trade secret information.  M/O deny the allegation that they have caused any injury to Gecko, or that Gecko has no adequate remedy at law.   M/O lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 115 and, on that basis, deny those allegations.

<u>**COUNT I**</u>
**TRADE SECRET MISAPPROPRIATION**
**FEDERAL DEFEND TRADE SECRETS ACT (18 U.S.C. § 1836 *et seq.*)**
**(Gecko v. All Defendants)**

116.    Gecko incorporates the foregoing paragraphs as though fully set forth herein.

**ANSWER:** M/O incorporate their answers to the foregoing paragraphs as though fully set forth herein.

117. Gecko owns and possesses certain trade secret information alleged above, including, without limitation, Gecko's Stolen Files, Gecko's customer list and contacts, purchasing history and cycles; pricing methodologies; component information; cost and gross margin information; Gecko's proprietary inspection methods and techniques; information concerning the delivery of Gecko's services; information concerning the data-gathering and data-processing techniques and methodologies; and proposals, quotations, business strategies and budgeting information, and valuable trade secrets with respect to Gecko's R-AUT and TriLat technologies.

**ANSWER:** M/O deny the allegation that Gecko identified any trade secret information in the Complaint nor did it prove the existence of any trade secret information at a preliminary injunction hearing.

118. Gecko's trade secret information relates to products and services used in, or intended for use in, interstate or foreign commerce.

**ANSWER:** M/O deny the allegation that Gecko identified any trade secret information in the Complaint nor did it prove the existence of any trade secret information at a preliminary injunction hearing. M/O lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 118 and, on that basis, deny those allegations.

119. Gecko has undertaken efforts that are reasonable under the circumstances to maintain the secrecy and confidentiality of the trade secrets at issue.

**ANSWER:** M/O deny the allegations in paragraph 119.

120. Gecko's trade secret information derives independent economic value from not being generally known to, and not being readily ascertainable through proper means by another person who could obtain economic value from the disclosure or use of the information.

**ANSWER:** M/O deny the allegation that Gecko identified any trade secret information in the Complaint. M/O lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 120 and, on that basis, denies those allegations.

121. Defendants knew or should have known under the circumstances that the information misappropriated by Defendants constitutes trade secrets.

**ANSWER:**    M/O deny the allegation that Gecko identified any trade secret information in the

Complaint.  Further answering, M/O deny the allegations in paragraph 121.

122.    Defendants misappropriated and threaten to further misappropriate trade secrets at least by acquiring trade secrets with knowledge of or reason to know that the trade secrets were acquired by improper means, and Defendants are using and threatening to use the trade secrets acquired by improper means without Gecko's consent.

**ANSWER:**    M/O deny the allegation that Gecko identified any trade secret information in the

Complaint.  Further answering, M/O deny the allegations in paragraph 122.

123.    As a direct and proximate result of Defendants' conduct, Gecko has suffered and, if Defendants' conduct is not stopped, will continue to suffer severe competitive harm, irreparable injury and significant damages in an amount to be proven at trial.

**ANSWER:**    M/O deny the allegations in paragraph 123.

124.    Gecko has also incurred, and will continue to incur, additional damages, costs and expenses as a result of Defendants' misappropriation.  As a further proximate result of the misappropriation and use of Gecko's trade secrets, Defendants have been unjustly enriched.

**ANSWER:**    M/O deny the allegation that Gecko identified any trade secret information in the

Complaint.  Further answering, M/O deny the allegations in paragraph 124.

125.    The aforementioned acts of Defendants were willful, malicious and fraudulent. Gecko is therefore entitled to an award of punitive damages.

**ANSWER:**    M/O deny the allegations in paragraph 125 as to them.

126.    Defendants' actions constitute misconduct of a continuing nature for which Gecko has no adequate remedy at law.  Unless and until enjoined and restrained by order of this Court, Defendants will continue to retain and use Gecko's trade secrets to enrich themselves and divert business opportunities from Gecko.

**ANSWER:**    M/O deny the allegation that Gecko identified any trade secret information in the

Complaint nor did it prove the existence of any trade secret information at a preliminary injunction

hearing.  M/O lack knowledge or information sufficient to form a belief as to the truth of the

remaining allegations in paragraph 126 and, on that basis, denies those allegations.

## COUNT II
## MISAPPROPRIATION OF TRADE SECRETS
## ILLINOIS UNIFORM TRADE SECRETS ACT (765 ILCS 1065/1 *et seq.*)
### (Gecko v. All Defendants)

127.    Gecko incorporates the foregoing paragraphs as though fully set forth herein.

**ANSWER:**    M/O incorporate their answers to the foregoing paragraphs as though fully set forth

herein.

128.    For the reasons set forth above, Defendants' conduct constitutes trade secret misappropriation under the Illinois Uniform Trade Secrets Act, and Gecko is entitled to all appropriate relief provided for therein.

**ANSWER:**    M/O deny the allegation that Gecko identified any trade secret information in the

Complaint nor did it prove the existence of any trade secret information at a preliminary injunction

hearing.  M/O deny that the Illinois Uniform Trade Secrets Act applies. Further answering, M/O deny

the allegations in paragraph 128 to the extent they relate to themselves.  M/O lack knowledge or

information sufficient to form a belief as to the truth of the remaining allegations in paragraph 128

and, on that basis, denies those allegations.

## COUNT III
## CONVERSION
### (Gecko v. Mendoza)

129.    Gecko incorporates the foregoing paragraphs as though fully set forth herein.

**ANSWER:**    M/O incorporate their answers to the foregoing paragraphs as though fully set forth

herein.

130.    Before he resigned from Gecko, Mendoza retained equipment that is owned by and belongs to Gecko and to which Gecko has an absolute and unconditional right to possession. Further, Mendoza improperly took and retained Gecko's Stolen Files.

**ANSWER:**    Mendoza admits that he unknowingly retained some Gecko equipment but has

returned all such equipment to the Plaintiff.

131.    Mendoza's retention of Gecko's Stolen Files and the aforementioned equipment was a wrongful act and disposition of Gecko's property rights.

**ANSWER:**    Mendoza admits that he unknowingly retained some Gecko equipment but has returned all such equipment to the Plaintiff.    Mendoza denies the remaining allegations in paragraph 131.

132.    Mendoza did not and does not have Gecko's consent to retain Gecko's Stolen Files and the equipment, and Gecko has demanded that Mendoza return the equipment.

**ANSWER:**    Mendoza admits that Gecko demanded the return of equipment which has been accomplished. .

133.    Mendoza has failed to return the equipment to Gecko and has deprived Gecko of its right to the exclusive possession and use of its property.

**ANSWER:**    Mendoza denies the allegations in paragraph 133 as all Gecko equipment has been returned.

134.    Mendoza has no lawful justification for his conduct or refusal to surrender Gecko's property.

**ANSWER:**    Mendoza denies the allegations in paragraph 134 as all Gecko equipment has been returned.

135.    Mendoza has been unjustly enriched through his conversion of the equipment and Gecko's Stolen Files.

**ANSWER:**  Mendoza denies the allegations in paragraph 135.

136.    Equity requires that Mendoza be declared as trustee in a constructive trust for Gecko with respect to the equipment and Gecko's Stolen Files, as well as any profits or benefits he has derived through his possession and use of that equipment and Gecko's Stolen Files.

**ANSWER:**    Mendoza denies the allegations in paragraph 136 as all Gecko equipment has been returned.

137.    As a result of Mendoza's conduct, Gecko has suffered damages.

**ANSWER:**    Mendoza denies the allegations in paragraph 137.

## COUNT IV
## BREACH OF CONTRACT
### (Gecko v. Mendoza)

138.    Gecko incorporates the foregoing paragraphs as though fully set forth herein.

**ANSWER:**    Mendoza incorporates his answers to the foregoing paragraphs as though fully set forth herein.

139.    Mendoza and Gecko entered into the Confidential Information and Invention Assignment Agreement, a valid and enforceable contract.

**ANSWER:**    Mendoza denies entering into a Confidential Information and Invention Assignment Agreement with Gecko during his employment.

140.    Under the terms of the Agreement, Mendoza had an obligation to use Gecko's Confidential Information only for the benefit of Gecko and to the extent authorized by Gecko.

**ANSWER:**    Mendoza denies entering into a Confidential Information and Invention Assignment Agreement with Gecko during his employment.

141.    By taking, misusing, and exploiting Gecko's Confidential Information for his own benefit and for the benefit of Summit, Mendoza has breached the Agreement.

**ANSWER:**    Mendoza denies entering into a Confidential Information and Invention Assignment Agreement with Gecko during his employment, and further, denies knowingly misusing such information for his own benefit.

142.    In addition, under the terms of the Agreement, Mendoza had an obligation to return "any and all devices, records, data, note, reports, proposals, lists, correspondence, specifications, drawings, blueprints, sketches, laboratory notebooks, materials, flow charts, equipment, other documents or property, or reproductions of any of the aforementioned items developed by [him] pursuant to the Relationship or otherwise belonging to the Company" upon his termination from employment.

**ANSWER:**    Mendoza denies entering into a Confidential Information and Invention Assignment Agreement with Gecko during his employment. Mendoza admits that he should have more quickly returned the remaining Gecko equipment that was not his.

143.     By retaining and refusing to return Gecko's Stolen Files and the equipment noted herein, Mendoza has breached the Agreement.

**ANSWER:**     Mendoza denies entering into a Confidential Information and Invention Assignment Agreement with Gecko during his employment.  Mendoza admits that he should have more quickly returned the remaining Gecko equipment that was not his.

144.     Pursuant to each of the Agreements, Mendoza agreed that "violation of this Agreement by me may cause the Company irreparable harm, and therefore I agree that the Company will be entitled to seek extraordinary relief in court, including, but not limited to, temporary restraining orders, preliminary injunctions and permanent injunctions without the necessity of posting a bond or other security (or, where such a bond or security is required, I agree that a $1,000 bond will be adequate), in addition to and without prejudice to any other rights or remedies that the Company may have for a breach of this Agreement." (Agreement § 12(g).)

**ANSWER:**     Mendoza denies entering into a Confidential Information and Invention Assignment Agreement with Gecko during his employment, thus, the cited language does not apply to him..  Mendoza admits that he should have more quickly returned the remaining Gecko equipment that was not his.

145.     As a direct and proximate result of Mendoza's breaches, Gecko has sustained damages.

**ANSWER:**     Mendoza denies the allegations in paragraph 145.

## COUNT V
## REACH OF CONTRACT
### (Gecko v. Ortega)

146.     Gecko incorporates the foregoing paragraphs as though fully set forth herein.

**ANSWER:**     Ortega incorporates his answers to the foregoing paragraphs as though fully set forth herein.

147.     Ortega and Gecko entered into the Confidential Information and Invention Assignment Agreement, a valid and enforceable contract.

**ANSWER:**     Ortega admits to entering into an agreement with Gecko during his employment.

148.     Under the terms of the Agreement, Ortega agreed that for a period of twelve months following the termination of his relationship with Gecko, he "shall not, directly or indirectly, solicit, induce, recruit or encourage any of the Company's employees or consultants to terminate their relationship with the Company, or attempt to solicit, induce, recruit, encourage or take away employees or take away employees or consultants of the Company, either for myself or for any other person or entity."

**ANSWER:**     Ortega admits that the best evidence of what the agreement's terms are comes from the agreement itself and deny any characterization by Plaintiff.  Further answering, Ortega denies the allegations in paragraph 148.

149.     By soliciting a current Gecko employee to leave Gecko's employment and become a Summit employee, Ortega has breached the Agreement.

**ANSWER:**     Ortega denies the allegations in paragraph 149.  Further answering, while Ortega had conversations with friends who are still employed by Gecko, he never solicited anyone.  Moreover, Ortega did not have the power or authority to hire anyone or give anyone an offer letter.

150.     Moreover, under the terms of the Agreement, Ortega had an obligation to use Gecko's Confidential Information only for the benefit of Gecko and to the extent authorized by Gecko.

**ANSWER:**     Ortega admits that the best evidence of what the agreement's terms are comes from the agreement itself and deny any characterization by Plaintiff.  Further answering, Ortega did not take any confidential information as his superior told him at the time of the exit interview that he could retain hard drive devices.

151.     By taking, misusing, and exploiting Gecko's Confidential Information for his own benefit and for the benefit of Summit, Ortega has breached the Agreement.

**ANSWER:**     Ortega denies the allegations in paragraph 151.

152.     Pursuant to each of the Agreements, Ortega agreed that "violation of this Agreement by me may cause the Company irreparable harm, and therefore I agree that the Company will be entitled to seek extraordinary relief in court, including, but not limited to, temporary restraining orders, preliminary injunctions and permanent injunctions without the necessity of posting a bond or other security (or, where such a bond or security is required, I agree that a $1,000 bond will be adequate), in addition to and without prejudice to any other rights or remedies that the Company may have for a breach of this Agreement." (Agreement § 12(g).)

**ANSWER:**     Ortega admits that the best evidence of what the agreement's terms are comes from the agreement itself and deny any characterization by Plaintiff.  Ortega denies that he has violated any of the agreements terms.

153.     As a direct and proximate result of Ortega's breaches, Gecko has sustained damages.

**ANSWER:**     Ortega denies the allegation in paragraph 153.

**COUNT VI**
**TORTOIUS INTERFERENCE WITH EXISTING CONTRACT AND PROSPECTIVE ECONOMIC ADVANTAGE**
**(Gecko v. All Defendants)**

154.     Gecko incorporates the foregoing paragraphs as though fully set forth herein.

**ANSWER:**     M/O incorporate their answers to the foregoing paragraphs as though fully set forth herein.

155.     Gecko has ongoing contractual relationships with its customers and has a reasonable expectation that those relationships will continue.

**ANSWER:**     M/O lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 155 and, on that basis, denies those allegations.

156.     Gecko also has a reasonable expectation of entering into further valid business relationships with its current and prospective clients.

**ANSWER:**     M/O lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 156 and, on that basis, deny those allegations.

157.     At all relevant times, Defendants were and continue to be aware of Gecko's ongoing business and contractual relationships with its customers and business expectancies with prospective customers.

**ANSWER:**     M/O deny the allegations in paragraph 157 to the extent they relate to M/O. M/O lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 157 and, on that basis, denies those allegations.

158.    Defendants have intentionally interfered, and are continuing to interfere, with Gecko's ongoing business and contractual relationships with its customers as well as its prospective business relationships.

**ANSWER:**    M/O deny the allegations in paragraph 158 to the extent they relate to M/O.  M/O lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 158 and, on that basis, denies those allegations.

159.    Defendants are using wrongful means to interfere with Gecko's ongoing business and contractual relationships with its customers and prospective customers by, among other things, improperly using, disclosing and/or relying upon Gecko's proprietary, confidential, and trade secret information regarding those customers, misusing Gecko's Stolen Files, exploiting Gecko's reputation and goodwill with those customers and by violating Gecko's legal rights.

**ANSWER:**    M/O deny the allegations in paragraph 158 to the extent they relate to M/O.  M/O lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 158 and, on that basis, denies those allegations.

160.    Ortega has interfered, and is continuing to interfere, with Gecko's ongoing business and contractual relationships with its employees.

**ANSWER:**    Ortega denies the allegation in paragraph 160.

161.    Defendants' conduct is not privileged or justified, and it otherwise represents an abuse of any conditional privilege that might have otherwise applied.

**ANSWER:**    M/O deny the allegations in paragraph 161 to the extent they relate to M/O.  M/O lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 161 and, on that basis, denies those allegations.

162.    As a direct and proximate result of Defendants' actions, Gecko has suffered and will continue to suffer both monetary and irreparable harm including, but not limited to, lost profits, lost customers, lost business opportunities, lost employees, the loss of proprietary and confidential information and harm to Gecko's reputation, goodwill and competitive advantage.

**ANSWER:**    M/O deny the allegations in paragraph 162 to the extent they relate to M/O.

163.    Gecko's injuries cannot be fully compensated by an award of monetary damages. Gecko has no adequate remedy at law for those damages and is entitled to appropriate injunctive relief.

**ANSWER:**    M/O deny the allegations in paragraph 163 to the extent they relate to M/O. M/O deny that Gecko is entitled to any injunctive relief.

164.    Unless enjoined, Defendants' wrongful acts will continue.

**ANSWER:**    M/O deny the allegations in paragraph 164 to the extent they relate to M/O. M/O deny that Gecko is entitled to any injunctive relief.

<u>**COUNT VII**</u>
**TORTIOUS INTERFERENCE WITH EXISTING CONTRACTS**
**(Gecko v. Summit)**

165.    Gecko incorporates the foregoing paragraphs as though fully set forth herein.

**ANSWER:**    M/O incorporate their answers to the foregoing paragraphs as though fully set forth herein.

166.    Gecko entered into Confidential Information and Invention Assignment Agreements with Mendoza and Ortega, which Agreements are valid, enforceable and binding on Mendoza and Ortega.

**ANSWER:**    M/O are not parties to this claim and therefore no answer to this allegation is required.

167.    Under the terms of their Agreements, both Mendoza and Ortega agreed to "hold in strictest confidence, and not to use, except for the benefit of the Company and … not to disclose to any person, firm, corporation or other entity, without written authorization from the Company in each instance, any Confidential Information" obtained during the term of their employment with Gecko."

**ANSWER:**    M/O are not parties to this claim and therefore no answer to this allegation is required.

168.    Further, Mendoza and Ortega agreed to "inform any entity or person with whom I may seek to enter into a business relationship … of my contractual obligations under this Agreement" for one year following the termination of their employment relationship.

**ANSWER:**    M/O are not parties to this claim and therefore no answer to this allegation is required.

169. Summit was aware of the existence of both Agreements.

**ANSWER:** M/O are not parties to this claim and therefore no answer to this allegation is required.

170. Summit intentionally procured breaches of the Agreements. Upon information and belief, Summit has developed and is developing a product or products substantially similar to or virtually identical to R-AUT and TriLat systems developed by Gecko, with Mendoza's and Ortega's assistance and their use of Gecko's proprietary, confidential, and trade secret information, as well as Gecko's Stole Files, in violation of their Agreements.

**ANSWER:** M/O are not parties to this claim and therefore no answer to this allegation is required.

171. Summit's interference with the Agreements was without justification.

**ANSWER:** M/O are not parties to this claim and therefore no answer to this allegation is required.

172. Summit acted with malice toward Gecko when tortiously interfering with the Agreements.

**ANSWER:** M/O are not parties to this claim and therefore no answer to this allegation is required.

173. Gecko has suffered damages as a direct and proximate result of Summit's tortious interference with Gecko's Agreements with Mendoza and Ortega.

**ANSWER:** M/O are not parties to this claim and therefore no answer to this allegation is required.

## COUNT VIII
### CIVIL CONSPIRACY
### (Gecko v. All Defendants)

174. Gecko incorporates all of the foregoing paragraphs as though fully set forth herein.

**ANSWER:** M/O incorporate their answers to all of the foregoing paragraphs as though fully set forth herein.

175.     Defendants knowingly entered into a combination with one another with the unlawful objective to misappropriate Gecko's trade secret and confidential information, convert its property, engage in unfair competition against Gecko, and tortiously interfere with Gecko's contracts and/or prospective economic advantage.

**ANSWER:**     M/O deny the allegations in paragraph 175 to the extent they relate to M/O.

176.     Each of Summit, Mendoza, and Ortega is a separate legal person who conspired to pursue these unlawful ends. Each of them was acting for his or its own personal financial gain in actively participating in the civil conspiracy.

**ANSWER:**     M/O admit the allegation that each of Summit, Mendoza, and Ortega is/are separate

legal persons.  M/O deny all other allegations in paragraph 176.

177.     Each of Summit, Mendoza, and Ortega committed unlawful acts in furtherance of the civil conspiracy, as set forth more fully herein.

**ANSWER:**     M/O deny the allegations in paragraph 177.

178.     As a result of the civil conspiracy, Gecko has suffered and will continue to suffer both monetary and irreparable harm including, but not limited to, lost profits, lost customers, lost business opportunities, the loss of proprietary and confidential information and harm to the Gecko's reputation, goodwill and competitive advantage.

**ANSWER:**     M/O deny the allegations in paragraph 178.

## **PRAYER FOR RELIEF**

WHEREFORE, Gecko Robotics, Inc. respectfully requests a judgment in its favor and against Defendants Juan Roberto Mendoza Mora, Angel Ortega, and Summit NDE, LLC as follows:

(a)     Upon hearing, a preliminary injunction to issue immediately and, upon final trial, a permanent injunction,

> i) Enjoining and restraining all Defendants from further misappropriating, using, disclosing or disseminating Gecko's proprietary and trade secret information;
> ii) Ordering the Defendants to return to Gecko and to delete from their possession Gecko's Stolen Files;
> iii) Enjoining and restraining all Defendants from selling any products or services that were created using Gecko's proprietary and trade secret information, including Gecko's Stolen Files;
> iv) Enjoining and restraining all Defendants from selling any products or services that are substantially similar to or

> virtually identical with Gecko's R-AUT and TriLat technologies;
>
> v) Enjoining and restraining Mendoza and Ortega from performing any services for or on behalf of Summit that are likely to require Mendoza and Ortega to use or disclose Gecko's trade secret information:
>
> vi) Ordering the return to Gecko of all equipment and other property that remains in Defendants' possession, custody or control; and
>
> vii) Ordering any other relief that is just and proper under the circumstances.

(b)     After a final hearing, an award in Gecko's favor and against Defendants for compensatory damages and/or an equitable accounting, disgorgement of all profits improperly obtained by the Defendants, a constructive trust on all profits and proceeds obtained by the Defendants as a result of their improper conduct, reimbursement of all costs incurred in connection with this litigation, punitive damages and such other relief as the Court deems proper.

**ANSWER:**     M/O deny that Gecko is entitled to any of the relief it seeks.

**JURY TRIAL DEMANDED ON**
**ALL CLAIMS SO TRIABLE**

**ANSWER:**     M/O demand trial by jury.

**AFFIRMATIVE DEFENSES**

**FIRST AFFIRMATIVE DEFENSE**
(Failure to State a Cause of Action)

Gecko fails to state a claim upon which relief can be granted against M/O, including because (1) Gecko has not identified any trade secrets with particularity, has not alleged that it took sufficient steps to guard the confidentiality of those particular alleged trade secrets, has not alleged that those particular trade secrets were not the subject of public knowledge and/or known to those in the field and/or readily ascertainable by those in the field, has not shown that each particular alleged trade secret derives independent economic value from not being generally known to the public or readily ascertainable by others in the field, and has not shown that M/O obtained any valid and protectable trade secret through improper means; (2) Gecko has not shown that it has current and prospective economic relationships, that M/O had knowledge of those relationships, or that M/O is tortiously interfering with one or more of those relationships; and (3) Gecko has not shown the existence of any conspiracy between Defendants or that it has been or will be harmed by any alleged conspiracy.

## SECOND AFFIRMATIVE DEFENSE
### (Unclean Hands)

Gecko is barred from maintaining its claims as a result of its unclean hands with respect to the alleged events upon which the Complaint is based.

## THIRD AFFIRMATIVE DEFENSE
### (Waiver/Forfeiture)

Gecko waived, forfeited, or otherwise relinquished any right to assert the claims in the Complaint.

## FOURTH AFFIRMATIVE DEFENSE
### (Estoppel)

Gecko, by its conduct, is estopped from asserting the claims in the Complaint.

## FIFTH AFFIRMATIVE DEFENSE
### (Laches)

Gecko's claims are barred by the doctrine of laches.

## SIXTH AFFIRMATIVE DEFENSE
### (Illinois Uniform Trade Secrets Act (765 ILCS 1065/1 et seq.))

While denying that Gecko has stated a valid claim under the Illinois Uniform Trade Secrets Act, to the extent such a claim exists, M/O plead all defenses available under that Act and states that any such claim is limited by the provisions of that Act. Moreover, Gecko has failed to comply with the Indiana Uniform Trade Secrets Act and all defenses available under that Act and states that any such claim is limited by the provisions of that Act.

## SEVENTH AFFIRMATIVE DEFENSE
### (Defend Trade Secrets Act (18 U.S.C. § 1836 et seq.))

While denying that Gecko has stated a valid claim under the Defend Trade Secrets Act, to the extent such a claim exists, M/O plead all defenses available under that Act and states that any such claim is limited by the provisions of that Act.

## EIGHTH AFFIRMATIVE DEFENSE
### (Good Faith)

At all relevant times, M/O acted reasonably, in good faith, and in reliance on the acts and transactions that are the subject of the Complaint, based upon the relevant facts and circumstances known to them at the time they so acted. Accordingly, recovery against M/O is barred.

## NINTH AFFIRMATIVE DEFENSE
(Failure to Mitigate)

Gecko failed to mitigate damages and is therefore barred from recovery.

## TENTH AFFIRMATIVE DEFENSE
(Inequitable Conduct)

Gecko's claims are barred in whole or in part by its inequitable conduct.

## ELEVENTH AFFIRMATIVE DEFENSE
(No Trade Secret)

Gecko's claims are barred, in whole or in part, because Gecko does not have any information entitled trade secret protection because any such information has been disclosed to the public, competitors, the trade press, and others; any such information is readily ascertainable by independent development, independent discovery, or reverse engineering without breaching a legal duty or using other improper means; Gecko has not taken adequate measures to ensure the secrecy of any such information, and any such information is available through non-confidential means.

## TWELFTH AFFIRMATIVE DEFENSE
(No Trade Secret)

Gecko's trade secret claims are barred, in whole or in part, because they do not satisfy the specificity requirements of Illinois and Federal law.

## THIRTEENTH AFFIRMATIVE DEFENSE
(Preemption)

Gecko's claims, to the extent they are based on the confidential nature of the allegedly misappropriated material, are preempted, in whole or in part, by its trade secret claims.

## FOURTEENTH AFFIRMATIVE DEFENSE
(Unknown Defenses)

M/O may have additional affirmative defenses available of which they are not yet fully aware. M/O reserves their right to assert additional affirmative defenses after they have been ascertained.

## FIFTEENTH AFFIRMATIVE DEFENSE
(No Injunctive Relief)

Plaintiff has failed to demonstrate that a remedy in equity is warranted, that the grant of injunctive relief would be equitable, or that the balance of hardships tips in its favor.

## SIXTEENTH AFFIRMATIVE DEFENSE
(Dismissal)

The Plaintiff has failed to identify any trade secrets in its Complaint for Preliminary Injunctive Relief and Damages or at the Preliminary Injunction Hearing which should be denied.

Respectfully submitted,

**KORANSKY, BOUWER & PORACKY, P.C.**

 /s/ *Paul B. Poracky*
Paul B. Poracky (#10899-45)
425 Joliet Street, Suite 425
Dyer, Indiana 46311
T: (219) 865-6700
E: pporacky@kblegal.net

## CERTIFICATE OF SERVICE

I certify that on February 27, 2024, I caused to service of the foregoing upon all counsel of record via CM/ECF.

By:  /s/ *Paul B. Poracky*
         Paul B. Poracky (#10899-45)