UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

| | | |
|---|---|---|
| GECKO ROBOTICS, INC.., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 2:23-CV-229-PPS-JEM |
| | ) | |
| SUMMIT NDE, LLC, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## **OPINION AND ORDER**

Two former employees of Plaintiff Gecko Robotics resigned their employment and are alleged to have stolen trade secrets and other documents on their way out the door. They are further alleged to have used this material at their new employer, defendant Summit. In this protracted litigation, Gecko Robotics' motion for a preliminary injunction has already been pending for a year. This case was (incorrectly) filed in the Northern District of Illinois in March, 2023 and was transferred to me on July 3, 2023. [DE 45.] Magistrate Judge Martin then granted the parties' joint request to conduct expedited discovery and continue a hearing on the preliminary injunction. [DE 79, 90.] In addition, on September 14, 2023, the parties agreed to an order for the return of Gecko's electronically stored information, including Defendants providing electronic copies of any Gecko files in their possession, and returning any physical property to Gecko. [DE 88.] A joint protective order was also entered. [DE 89.] After a further continuance requested by the parties, I finally held a two-day evidentiary hearing on the request for a preliminary injunction on December 7 and 8, 2023. [DE 110.]

Following that hearing, the parties agreed to a settlement conference before Judge Martin.  I was hopeful that, at a minimum, they could streamline the extensive issues surrounding the motion for preliminary injunction.  Better still, I thought there was a good chance that the parties could come together on terms of an agreed injunction, for example, with the appointment of a forensic examiner.  Unfortunately, none of this happened; the parties were unable to resolve any of the issues.  Instead, they asked for additional time to file post-hearing briefing and longer page limits to boot. [DE 119, 123, 127.]  Having now received those additional filings, the matter is finally teed up for disposition.  In a nutshell, because I find that Gecko is not suffering from irreparable harm, an injunction is not warranted.

**Factual Background**

Gecko initiated this action against its two former employees, Juan Roberto Mendoza Mora ("Mendoza") and Angel Ortega, and the company they went to work for—Summit.  The verified complaint raises a bevy of claims—the usual suspects when allegations of trade secret misappropriation are involved: 1) the Federal Defend Trade Secrets Act ("FDTSA"); 2) Illinois Uniform Trade Secrets Act ("IUTSA"); 3) state law conversion (against Mendoza); 4) breach of contract (against Mendoza and Ortega); 5) tortious interference with existing contracts and prospective economic advantage; 6) tortious interference with existing contracts (against Summit); and 7) the often alleged but seldom proved claim of "civil conspiracy."  Sorting through the clutter, at bottom, the complaint alleges that Mendoza and Ortega stole Gecko's trade secrets to allow

Summit to "replicate cutting-edge ultrasonic inspection technology first pioneered by Gecko, and to target Gecko's customers with that technology." [DE 1, ¶ 1.]

When Gecko filed its motion for preliminary injunction last year [DE 9], it sought the following relief:

1. Order the Defendants to return to Plaintiff all copies of Gecko's electronically stored information improperly retained, downloaded, copied or otherwise transferred by Defendants Mendoza and Ortega from Gecko before or at the time of or after their resignation from Gecko;

2. Order the Defendants to retrieve and return to Plaintiff all copies of the information referenced in Paragraph 1 from any and all individuals or entities to whom such information was previously provided;

3. Order the Defendants to delete all copies of the information referenced in Paragraphs 1 and 2 after complying with those paragraphs;

4. Order the Defendants immediately to stop using or disclosing any of Gecko's confidential, proprietary or trade secret information;

5. Order the Defendants immediately to stop developing, testing, demonstrating, advertising, marketing, using or selling any products or services created, designed, developed or commercialized using Plaintiff's confidential and trade secret information;

6. Order Defendants Mendoza and Ortega to comply with their respective Confidential Information and Invention Assignment Agreements with Gecko; and

7. Order any such further relief the Court deems just and proper.

Much of the relief originally sought by Gecko has already taken place with the return to Gecko of documents and tangible items impermissibly taken by the Defendants last Fall. [DE 88.] Evidently, Gecko remains dubious that the Defendants have actually returned to them all of the items that were unlawfully taken. So they

3

moved forward with the request for a preliminary injunction, and in doing so, they now seek a greatly expanded injunction. After the hearing, Gecko presented to the court a "[Proposed] Preliminary Injunctive Order" which seeks a broad injunction including things like the appointment of a special master and forensic examiner to search Summit's files to ensure that Summit did in fact return all copies of files taken by Mendoza and Ortega (and didn't retain copies). [*See* DE 135, Proposed Order.] Additionally, Gecko wants me to enjoin the Defendants from engaging in two kinds of testing which would, in essence, put Summit out of business. *Id.*

At the hearing on the motion for preliminary injunction, the following witnesses testified: Ryan DeSoto (general manager of Gecko Robotics' Houston office); Brett Creasy (an expert in forensic analysis); defendants Mendoza and Ortega; and Joshua Fuller (Director of Operations for Summit). Here's what I learned.

Gecko performs non-destructive tests to detect damage on various industrial assets (like water tanks, boilers, or gas pipes). [Tr. at 63.][1] To put it in layman's terms, they use remote-controlled robots that crawl on the outside of things like water tanks and shoot ultrasonic rays into the material, analyze those results, and then report back to the customer on the integrity of the material and whether there are any weaknesses, cracks, or other damage. Among the services it provides, Gecko uses robots to perform

---

[1] The transcript for the preliminary injunction hearing is in two volumes on the docket. Docket entry 116 (Volume I) consists of pages 1-256 and Docket entry 117 (Volume II) is pages 259-520. For the sake of brevity, the volume number will not be referred to, the court will just cite to "Tr." and then the page number.

ultrasonic testing (sometimes called "UT"). [*Id.* at 65.]

In addition to conventional UT testing, Gecko also performs "phased array" ultrasonic testing (also referred to as "PAUT," "rapid AUT," or "RAUT.") [*Id.* at 64-65.] For this testing, 100 percent of the equipment used to perform it is purchased from other manufactures and is "off-the-shelf" equipment. [*Id.* at 127.] Gecko utilizes PAUT for two main purposes: (1) corrosion mapping; and (2) weld inspections. [*Id.* at 64.] Gecko also offers Tri-Lateral Phased Array services ("TriLat"), which is an ultrasonic method using two probes positioned at different angles to detect damage in equipment used in sour service (or when a substance has a high amount of hydrogen). [*Id.* at 85.] Gekco markets and provides its services to companies in the oil and gas industry (among other industries), including Marathon, BP, and ExxonMobil. [*Id.* at 131.]

Gecko has approximately 250 employees and provides its services throughout the United States. [*Id.* at 63-64.] Mendoza was hired by Gecko in 2020 as an advanced services technician. [*Id.* at 267.] He's been in this line of work for more than 30 years. [Tr. at 486.] Being a service technician in this industry appears to be a somewhat peripatetic occupation with people regularly moving from company to company. Indeed, prior to working at Gecko, Mendoza worked for a competing firm named Iris, and all of the people at Gecko who started the phased array testing unit there came from Iris. [Tr. at 411-12, 505-06.]

While at Gecko, Mendoza spent about 70% of his time performing PAUT corrosion mapping inspections, and the remaining 30% of his time on PAUT weld

5

inspections. [*Id.* at 269.] He was involved in developing Gecko's PAUT and TriLat technologies. [*Id.* at 94.] Ortega was also hired by Gecko in 2020. [*Id.* at 416.] During his time with Gecko, Ortega performed PAUT corrosion mapping and weld inspections. [*Id.* at 417.] Gecko claims that it spent significant time and energy in-house to develop calibration and settings for the mapping inspections, as well as the specific mix of probes and other equipment that worked best with its calibration settings and parameters to perform the inspections. [Tr. at 83-84, 95-96, 71, 74, 88.]

During the hearing, I asked Gecko to specifically identify what trade secrets it was trying to protect and in response, counsel stated the trade secrets are: (1) specific calibration settings for its performance of phased array corrosion mapping; (2) specific calibration settings for its TriLat services; and (3) a 113-page estimate document taken by Mendoza before he left Gecko. [*Id.* at 23-26; Ex. 44.] In the several months before he left Gecko, Mendoza created a 113-page document containing customer contact information, quotes, invoices and other communications—a document that he created by copying and pasting information from Gecko's internal communication system. [Ex. 44; Tr. at 290-96.] That document has already been returned to Gecko. [Tr. at 300-01; 27-30.] Although Mendoza tried to insist during the hearing that he didn't know why he created this document, during his previous deposition, Mendoza said he took that document with him because he "was mad maybe." [Tr. at 298-99.]

Summit also provides non-destructive testing services, including PAUT, and it is a competitor of Gecko. [*Id.* at 12, 279.] Summit is an Indiana company that provides

6

services to mostly regional customers. Just like Gecko, Summit uses off-the-shelf equipment and software developed, marketed, and sold by third-party vendors. [Tr. at 12; DE 29-1 ¶ 13.] Summit services industrial clients including refineries and power plants. [Tr. at 510.]

Ortega resigned his employment with Gecko in May 2022. [*Id.* at 418.] Mr. Mendoza soon followed with an abrupt resignation from Gecko on July 21, 2022. [*Id.* at 277.] When Gecko learned that Mendoza had gone to Summit, it sent Mendoza a letter advising him of his obligations under the confidentiality and information assignment agreement and requested the return of Gecko equipment they thought he retained. [Ex. 9; Tr. at 103-04.] Communication like this went back and forth between the parties for quite a while.

There is no doubt that after leaving Gecko, both Mendoza and Ortega retained certain pieces of Gecko property, including electronic files from their work at Gecko and several PAUT probes, one of which Mendoza actually used for some work at Summit. [Tr. at 311-14.] Mendoza returned Gecko's equipment by June of 2023, although there is still some debate whether he still has one remote control for one of Gecko's robots. [*Id.* at 32, 38-39.] Summit reiterated over and over again during the hearing that all of the Gecko documents have been returned to Gecko, as well as the personal property that was initially missing, but Gecko remains dubious. They suspect the Defendants retained an electronic version of the documents. Therefore, they are concerned their alleged trade secrets are not sufficiently protected by the protective

7

order and the other written assurances that have already been given by Summit in this case. [*Id.* at 44-46, 49-51, 115, 262, 264-66.]

In looking at the harm that Gecko claims it is suffering as a result of Mendoza and Ortega allegedly stealing their trade secrets and bringing them to Summit, Mr. DeSoto testified that Gecko performed inspections on two different assets for Exxon located in Joliet in September 2022. [*Id.* at 124.] However, after Gecko was asked to bid on a job for Exxon Joliet in October 2022, they lost the bid to Summit. *Id.* According to DeSoto, Gecko's two previous jobs for Exxon Joliet had been for about $30,000. [*Id.* at 125.]

As I mentioned before, Gecko claims that it devoted a lot of time during the course of three to four months to develop Gecko's standardized PAUT calibration settings. [*Id.* at 76-77, 79-80, 91.] Gecko believes Summit stole these "plug and play" setups, as well as pricing quotes and other customer information, and this gives them an unfair advantage. [*Id.* at 71, 197-99.] But Mendoza credibly testified that just isn't so—Summit does not use any pre-set calibration files for any jobs/assets. [*Id.* at 341, 458, 466, 514.] Instead, Summit technicians (including Mr. Mendoza himself) calibrate the PAUT equipment and create a new set up file for each and every job they work on. *Id.* According to Mendoza and Ortega, they also never used any pre-set calibration files when they worked for Gecko. [Tr. 334-35, 453-55.] They explained that an old customer file wouldn't have any value to them because each project is unique; at each job the technician has to evaluate all of the different factors at play (the surface of the asset, the

8

thickness, the shape, etc.) when doing the testing. [*Id.* at 401, 454-55.] Moreover, Gecko's General Manager (Mr. DeSoto) admitted that all of Gecko's alleged secret calibration settings have changed since Mendoza and Ortega left Gecko. [*Id.* at 180.]

## Discussion

"A preliminary injunction is an extraordinary equitable remedy that is available only when the movant shows clear need." *Turnell v. Centimark Corp.*, 796 F.3d 656, 661 (7th Cir. 2015); *see also Girl Scouts of Manitou Council, Inc. v. Girl Scouts of the United States of Am., Inc.*, 549 F.3d 1079, 1085 (7th Cir. 2008) ("a preliminary injunction is an exercise of a very far-reaching power, never to be indulged in except in a case clearly demanding it.").

To obtain a preliminary injunction, the movant must first show: (1) a reasonable likelihood of success on the merits; (2) that no adequate remedy at law exists; and (3) that the party will suffer irreparable harm if the injunction is not granted. *Turnell v. CentiMark Corp.*, 796 F.3d 656, 661-62 (7th Cir. 2015). If Gecko can make this threshold showing, then I can weigh other factors, including balancing the harms of erroneously granting or erroneously denying injunctive relief, and the public interest. *Id.* at 62. The weight given to these factors is based on a sliding scale; in other words, the less likely the movant is to succeed on the merits, the more the balance of harms must weigh in their favor and vice versa. *Id.* Gecko bears the burden of showing that the injunction is warranted. *Courthouse News Serv. v. Brown*, 908 F.3d 1063, 1068 (7th Cir. 2018). "Mandatory preliminary injunctions – those requiring an affirmative act by the

9

defendant – are ordinarily cautiously viewed and sparingly used." *Mays v. Dart*, 974 F.3d 810, 818 (7th Cir. 2020) (quotation marks and citations omitted).

Irreparable harm is "harm that cannot be repaired and for which money compensation is inadequate." *Orr v. Shicker*, 953 F.3d 490, 502 (7th Cir. 2020) (quoting *Graham v. Med. Mut. Of Ohio*, 130 F.3d 293, 296 (7th Cir. 1997)); *see also Life Spine, Inc. v. Aegis Spine, Inc.*, 8 F.4th 531, 545 (7th Cir. 2021) (harm is irreparable if legal remedies available to the movant are inadequate, meaning they are seriously deficient as compared to the harm suffered). Because irreparable harm is a threshold requirement for granting injunctive relief, it is in my discretion to deny the requested injunction on this basis alone. *See Lawson Prods., Inc v. Avnet, Inc.*, 782 F.2d 1429, 1440-41 (7th Cir. 1986) (affirming the district court's denial of a preliminary injunction based on the absence of irreparable harm alone).

In this case, whatever its chance of success on the merits, the simple fact remains that Gecko has not shown *irreparable* harm. In other words, even giving Gecko the benefit of the doubt and assuming that it is reasonably likely to succeed on the merits, a preliminary injunction is still not appropriate because Gecko hasn't shown that it will suffer irreparable harm absent injunctive relief.

I certainly do not condone Mendoza making his 113-page "playbook" before he left Gecko and bringing those customer contacts and internal information along with him to Summit. The "playbook" has been returned to Gecko. Additionally, Gecko has not presented any evidence that it has suffered irreparable damage, much less damage

10

that would continue absent an injunction, as a result of Mendoza taking this information (plus other documents Mendoza and Ortega took with them). And, while it wasn't right for Mendoza to take some equipment from Gecko, and there may have been some initial harm to Gecko when Mendoza (inadvertently it seems) used one of Gecko's probes for several phased array inspections when he started at Summit, that equipment has been returned to Gecko. There is no reason this, if proved at trial, could not be recompensed by the payment of money damages.

To the extent Gecko argues it has lost customers, "harm stemming from lost customers or contacts may be quantifiable if the lost customers or contacts are identifiable." *DM Trans, LLC v. Scott*, 38 F.4th 608, 618 (7th Cir. 2022) (quoting *Life Spine*, 8 F.4th at 546). In other words, where business records enable a plaintiff to calculate the amount of lost sales, irreparable harm is usually not present. In this case, Gecko testified that after doing two jobs for Exxon Joliet, it then lost a bid package to Summit at Exxon Joliet. [Tr. 123-25; Exs. 37-38.] Yet during the hearing, it came out that Summit's competing bid package was significantly *more expensive* than Gecko's bid for the same work. [Tr. at 501-02.] So there doesn't seem to be any credence to Gecko's fear that Gecko knew of their secret pricing. *Id*.

What's more, it seems that Exxon chose Summit despite the higher bid because it had problems with earlier work Gecko had done for it. *Id.* Summit presented evidence showing that Exxon asked Summit for help with the two jobs Gecko was awarded and completed for them, and there was some evidence this was due to the poor quality of

11

Gecko's work. [*Id.* at 468-73.] Summit finished Gecko's work on those two projects and after that Exxon Joliet became a Summit client. [Tr. at 473-76, 134-36, 483-84.] Therefore, it seems more likely that Exxon Joliet became a client of Summit's due to the quality of its work and not that it had some kind of confidential information that helped it steal this customer away from Gecko. And in all events, regardless of the reason behind Exxon Joliet's decision to use Summit as its testing contractor, these are damages that can be readily calculated should Gecko prevail at trial. For example, Mr. Fuller testified that Summit earned approximately $250,000 from performing phased array corrosion mapping for Exxon Mobile Joliet in 2022. [*Id.* at 483-84.]

Gecko also argues its inability to keep two other customers—Marathon in Robinson, Illinois, and BP Whiting—is due to Summits' actions. [DE 126 ¶ 92; Tr. at 131.] This argument is a complete nonstarter. It's true that Gecko did some work at BP Whiting, and this continued for even three months after Ortega and Mendoza left Gecko. But then for some reason the work dried up and BP Whiting never asked Gecko back. [Tr. at 134.] Gecko also completed a number of projects for Marathon in Robinson in early 2022, and it presented testimony that after Mendoza joined Summit, Gecko has not performed another project for that customer. [Tr. at 125; Exs. 37-42.] But the reason this argument is a loser is because there is no evidence that Summit has performed *any work at all* at either of these facilities (BP Whiting or Marathon Robinson). [Tr. at 41-44.] Therefore, it is disingenuous for Gecko to insinuate that Summit "stole" these customers when there is no evidence Summit has ever done work at either of these

12

facilities. In short, the significance of the BP Whiting and Marathon Robinson parts of this story is entirely lost on me.

To the extent Gecko argues it has just generally lost opportunities now that Mendoza and Ortega have taken their breadth of knowledge to Summit [DE 132 at 11], the argument is unpersuasive. As I mentioned, whatever harm that may have been done in the way of lost profits is readily quantifiable. And as the Seventh Circuit has noted:

> A district court is within its discretion to find an adequate remedy at law, and thus no irreparable harm, where the corporation seeking injunctive relief can reasonably estimate the value of its lost profits. *Lawson Prods.*, 782 F.2d at 1440. [Plaintiff] does not dispute it can reasonably estimate the value of profits it lost from the business [when] the eleven customers at-issue transferred to [the competitor.] The district court was therefore within its discretion to conclude monetary damages were an adequate remedy at law.

*DM Trans*, 38 F.4th at 620.

Gecko cites *Life Spine* in support of its contention that losing customers to Summit constitutes irreparable harm. [DE 132 at 13-14.] However, that case is distinguishable. *Life Spine*, as the name implies, is a case involving spinal implant devices. Life Spine made a spinal implant device, and defendant Aegis contracted with Life Spine to distribute the device to hospitals and surgeons—although defendant promised to protect Life Spine's confidential information, it funneled information about the device to its parent company to help the parent company develop a competing spinal implant device. *Life Spine*, 8 F.4th at 534-35. In affirming the district court's grant of an injunction, the Seventh Circuit reasoned:

13

> Life Spine presented evidence that it would lose customers and market share because Aegis was marketing the AccelFix-XT "in the same finite pool of hospitals and surgeons in which Life Spine markets the Pro Lift." Granted, harm stemming from lost customers or contracts may be quantifiable if the lost customers are contracts that are identifiable. But here, the district court found that they were not fully identifiable. Rather, because hospitals do not publicize their contracts for spinal products, identifying and quantifying lost business "would be especially difficult" for Life Spine. And we have held that "it is precisely the difficulty of pinning down what business has been or will be lost that makes an injury irreparable." *Hess Newmark Owens Wolf, Inc. v. Owens*, 415 F.3d 630, 632 (7th Cir. 2005).

*Id.* at 545-46. The *Life Spine* Court also found the plaintiff had some likelihood of proving irreparable harm stemming from the loss of goodwill and reputation. *Id.* at 546. In this case, voluminous discovery has already been exchanged and there is no reason that Gecko cannot determine if any of its former clients are now clients of Summit, and identify the amount of business it has allegedly lost through Summit misappropriating its trade secrets.

To the extent Gecko argues Summit has an inappropriate "jump start" to its business because of the stolen and confidential information, the cases it cites aren't relevant in this instance. [DE 132 at 11.] Mendoza and Ortega have been service technicians in this industry for a long time. Indeed, Gecko poached Mendoza from his former employer, Iris. A court can't enjoin an employee from using the basic knowledge they have acquired over the years in plying their trade. *See Eaton Corp. v. Appliance Valves Corp.*, 526 F.Supp. 1172, 1180 (N.D. Ind. 1981) ("the general knowledge and skill obtained by an employee during his employment belongs to that employee

and can be utilized by him after terminating his employment. It is well settled that an employee, upon leaving his employment, may take with him and utilize the skill and general knowledge obtained by him during his employment."); *APC Filtration, Inc. v. Becker*, 646 F.Supp.2d 1000, 1008 (N.D. Ind. 2009) ("in a competitive market, an employee must be entitled to utilize the general knowledge and skills acquired through experience in pursuing his chosen occupation."). Moreover, according to Mendoza and Ortega, they never used any pre-set calibration files when they worked for Gecko [Tr. at 334-35, 453-55] and they credibly testified that old customer files wouldn't have any current value to them because for each project they needed to evaluate all of the different factors at play (the surface of the asset, the thickness, the shape, etc.). [*Id.* at 401, 454-55.]

Finally, here's the topper: as technology is apt to do, it is rapidly changing in this industry. Mendoza and Ortega left Summit nearly two years ago. Gecko waited nearly a year to file this case, and then filed it in the wrong district. Once it was transferred here, the case dragged along for several months while the parties took "expedited" discovery. I mention this because Mr. DeSoto from Gecko candidly admitted that in the meantime all of Gecko's alleged secret calibration settings have changed since Mendoza and Ortega left Gecko. [*Id.* at 180.] With this critical admission, I fail to see irreparable harm stemming from any alleged "jump start" Mendoza and Ortega gave to Summit when they joined that company. While there is evidence that Mendoza and Ortega took certain documents with them, there was no evidence that they've actually used these

15

documents in their current business. And if they did, money damages will serve as a balm.

In sum, because I find that Gecko will not suffer irreparable harm without an injunction, its request for a preliminary injunction is denied. Of course, this isn't to say that Gecko might not ultimately prevail in its underlying claims in this lawsuit. As I said at the hearing, what Mr. Mendoza did—by creating an elaborate 113 page document prior to leaving Gecko—was just plain wrong, and he shouldn't have done it. His scheming may prove to be his (and Summit's) undoing in this case. But at this point, I am simply not persuaded that the extraordinary remedy of a preliminary injunction is in order given the lack of persuasive evidence of irreparable harm.

## Conclusion

For the above-referenced reasons, Plaintiff's Motion for Preliminary Injunction [DE 9] is DENIED.

SO ORDERED.

ENTERED: March 29, 2024.

                    /s/ Philip P. Simon
                    PHILIP P. SIMON, JUDGE
                    UNITED STATES DISTRICT COURT